BANK BRUSSELS LAMBERT,
S.A., Plaintiff,

v.

INTERMETALS CORPORATION,
Defendant,

v.

BANK BRUSSELS LAMBERT, S.A., Joseph Botkier, Viraf Reporter, and Robert Lostal, Counterclaim Defendants.

No. 90 Civ. 4855(PNL).

United States District Court,
S.D. New York.

Dec. 18, 1991.

Marks Murase & White, New York City (P.J. Wilker and Andrew D. Rackear, of counsel), for plaintiff Bank Brussells and counterclaim defendants Joseph Botkier and Robert Lostal.

J. Owen Zurhellen, III, New York City, for defendant Intermetals Corp.

Feinberg, Felzen & Nigro, New York City (Scott Nigro, of counsel), for third-party defendant Viraf Reporter.

## OPINION AND ORDER

LEVAL, District Judge.

### Findings of Fact and Conclusions of Law

This is a dispute between a bank and its customer over credit extended to cover losses arising from an unsuccessful attempt to speculate in foreign currencies. The plaintiff is Bank Brussels Lambert, S.A. ("BBL"), a Belgian bank with a branch office at 630 Fifth Avenue, New York, New York. The defendant, Intermetals Corporation ("IM") is a New Jersey corporation with its principal place in New Jersey. IM counterclaims against BBL and crossclaims against three of its employees.

IM is engaged in the business of trading steel and other metals on an international basis. For several years prior to the facts giving rise to this dispute, IM had a banking relationship with BBL for the financing of IM's international trade in steel. On May 17, 1988 BBL and IM entered into a banking agreement. Under the agreement BBL had frequently extended credit to IM.

In October 1988 BBL undertook on IM's behalf a foreign exchange transaction to hedge IM's contract for the sale of steel payable at a future date in deutsche marks ("DM"). This hedge transaction was executed for IM by Viraf (Willie) Reporter, a foreign exchange trader servicing BBL's corporate desk. In the course of the discussions, Reporter spent time with Lawrence Traub, the principal of IM, and Michael Stock, an employee, explaining foreign exchange transactions. The hedge transaction was successfully carried out, protecting IM's profit in the steel sale by shielding it from the risks of fluctuation of the DM during the period of exposure.

The discussions of the hedge transaction led to discussions of speculative foreign exchange trading.[1] It was then decided that BBL would undertake to open and finance a discretionary account of speculative foreign exchange trading for IM which was to be traded by Reporter. BBL thus began to conduct a course of speculative foreign exchange trading for IM.

All of the transactions entered into by BBL for IM's account in the course of this speculative trading were in the "spot market." The "spot market" is essentially the current market, as distinguished from the futures market. Spot transactions in foreign currencies call for settlement within two days. *See* CFTC, Division of Trading and Markets, *Report on Exchanges of Futures for Physicals*, 124–127 (1987) ("CFTC Report"). The trader would cause IM to enter into a contract for the purchase or

---

1. Each side claims it was the other that expressed initial interest in undertaking speculative transactions. Who suggested the idea is of no importance to the resolution of the lawsuit.

sale of a foreign currency at an agreed U.S. dollar price, to be performed in two days. A purchase of a foreign currency would be made to speculate that, before settlement, the U.S. dollar would weaken as against that foreign currency. A sale of the foreign currency would effect a speculation that, in the intervening two days, the U.S. dollar would gain as against that foreign currency. When such contracts would come due in two days, the trader would either realize and book the gain or loss of U.S. Dollars by entering into a spot transaction that reversed the prior long or short position in the foreign currency, or would project the speculative position another two days out by executing a rollover. A rollover of an existing position would be accomplished by executing a pair of opposite spot transactions that simultaneously (at a new price) closed the position out and reestablished it. On a number of occasions, by executing a series of rollovers at each successive two-day maturity, BBL extended IM's long or short speculative position in a particular currency for substantial periods of time. In no case, however, did BBL execute for IM a contract that called for settlement more than two days in the future. IM never entered into a futures contract. At no time was IM involved in a position that speculated on price change over a future period of more than two days.

BBL immediately notified IM of every trade. In virtually every case, Reporter would call Stock at IM and notify him of the details immediately upon conclusion of the transaction. IM received a further call shortly afterward from BBL's confirmation desk, and finally it received written confirmation of every transaction promptly by mail.

When a position was closed out, the result would be posted to IM's demand deposit account. If the position resulted in a profit, that profit would be credited to IM's demand deposit account. If a loss was incurred, it would be charged to IM's account. If losses sent IM's account into negative balance, this meant that BBL was extending credit to IM.

When contracts were rolled over, the gain or loss that had been incurred as the result of past price changes would not be *posted* to IM's account; however, by comparing the present market on any day with the price at which the position had initially been purchased, one could "mark the position to market," ascertaining exactly how much profit or loss had been incurred as the result of past price fluctuation.

The first phase of trading took place between February and May of 1989 when all positions were closed out. This phase of trading resulted in an aggregate loss to IM of $273,350. Thus, at the end of this period, IM's account had a negative balance of $273,350.

The speculative activity was resumed during a second phase from approximately June 19, 1989 through October 3, 1989. Willie Reporter's trading during this period was quite successful and realized a profit for IM of $503,251. IM's account went into positive balance. The second phase ended because Willie Reporter left for vacation. He closed out all the positions before he left. IM withdrew more than $200,000 it had realized as net profits of the trading.

On November 1, 1989, after his return from vacation, Reporter began the third phase of his speculative foreign exchange trading for IM. In this third phase, the sizes of the speculative positions taken were increased. The results, however, were less successful. IM's account included a very large short position of DM 80 million, which was maintained for some time through a succession of spot rollovers against the strengthening deutsche mark. In early January 1990, the management of BBL became aware that IM's losses in its foreign exchange account (when marked to market) exceeded $1,000,000. BBL became alarmed because the losses resulted in BBL extending credit to IM of over $1,000,000. It was of no functional significance that some of the positions remained open so that the losses incurred had not been formally posted to IM's account. The losses revealed by marking the positions to market (and the consequent inevitable increase in IM's debt to BBL) were no less real,

notwithstanding that they had not been posted.[2] BBL asked Traub to attend a meeting, which was delayed until January 8, because Traub was on vacation in Puerto Rico. By the time of the meeting, IM's loss positions (and consequently the credit extended by BBL) had grown to approximately $1.8 million dollars.

At the meeting on January 8, BBL expressed concern that the loss position in the trading account exceeded the credit line of $1½ million dollars BBL that had established for IM. IM agreed to transfer $300,000 to BBL in order to bring IM within its $1½ million dollar credit line. It was decided that the speculative trading for IM's account should continue in an effort to bring its loss within more reasonable bounds. The next day BBL closed out IM's short position of DM 80 million. IM was surprised. Traub and Stock thought BBL had agreed to stick with its speculative positions in confidence that the market would turn in IM's direction.

The decision to sell out IM's short DM position was made by Joseph Botkier, BBL's Senior Vice President and Treasurer, who instructed Reporter to carry it out. Reporter disagreed with Botkier's assessment but carried out the instruction. As it turned out, the decision was unfortunate. A few days later, the DM weakened. Had the short position been maintained by rollovers until January 22, the loss position would have been eliminated. After January 8, Reporter was instructed by Botkier that he should not trade for the IM account without Botkier's approval.

Botkier later instructed Reporter to liquidate an Australian dollar position held for IM. Reporter disobeyed the instruction holding out for a better price. The market then turned against him causing additional losses. On January 23, Botkier ordered Reporter off the account and sent him on vacation; he was later let go.

At this point BBL assigned Robert Lostal to trade the IM account under Botkier's supervision. BBL told IM that Lostal would follow a tightly controlled technical approach that had produced substantial profits for BBL in its own foreign exchange trading over the past months. BBL told IM it was reasonable to expect that Lostal's trading would gradually work off IM's accumulated losses.

Immediately friction developed between Lostal and IM. IM sought to give instructions as to what trades should be made. Lostal understood that the trading was to be at the discretion of BBL and not under IM's instructions. Alexander Dinnell, who was in charge of BBL's foreign exchange operations, confirmed to IM that it could not "have it both ways." This meant that BBL agreed to extend financing for IM's speculation in foreign exchange on the understanding that this would be a discretionary account to be traded at BBL's discretion, but BBL would not finance speculation piloted by IM. In other words, BBL was not prepared both to finance IM's speculation and permit IM to call the shots. BBL asked IM to sign a letter confirming

---

**2.** To illustrate in a simplified context: Suppose a bank were to buy 100 shares of common stock for a customer at $50 a share, payment and delivery to take place two days later, and that the customer has posted no money to pay for the transaction. (i) If the stock is resold at the same price without the customer having put up any money, the customer will have incurred no profit or loss and no debit or credit balance will accrue to the customer's account (other than for expenses). (ii) If the stock is resold at $75/share or $25/share, a gain or loss will be realized, and depending upon which, either the bank will owe the customer $2,500 (the amount of the profit), or the customer will owe the bank $2,500 (the amount of the loss). (iii) If the stock goes up to $75/share or goes down to $25/share, the customer in economic terms *has*

*incurred* a gain or loss of $2,500, regardless whether the position is then sold out or is held for longer term speculation. This will inevitably result in the *eventual* posting of the gain or loss to the account, except to the extent it may be altered by the result of future speculation.

Excepting transaction costs and taxes, scenario (iii) is functionally identical to scenario (ii). Whether a particular moment is punctuated by closing out the position and causing the result to be posted to the account is of no economic significance. In either event, the gain or loss incurred through past price change is history and cannot be changed, although further speculation (whether by new transactions or by continuing to speculate on previously established positions) can bring about new gains or losses.

the understanding that its trading was to be in BBL's discretion, which was done.

During the period from January 26 through April 18, 1990, BBL continued to trade for IM's account with little success. On April 19, 1990 BBL decided to cease trading for IM's account and closed all positions. Upon the cessation of trading, IM's deficit position in its demand deposit account was approximately $1.5 million dollars.

BBL demanded of IM that it make good the deficit, reimbursing the credit extended by BBL. IM declined responsibility. BBL eventually brought this action to recover the deficit.

IM denies responsibility and counterclaims on numerous different theories: It contends it is entitled to the return of the $300,000 which it deposited with BBL on January 9, 1990; IM also contends that BBL had a contractual obligation to maintain the deutsche mark position that existed on January 8 until January 22, when it would have realized a net profit of $100,000.

## Discussion

BBL's argument is relatively simple. It undertook by agreement with IM to carry out speculative foreign currency trades for IM's account. When the trading was unprofitable it extended credit to IM to cover the losses. BBL sues to recover the loans that it extended to IM to cover the losses that were incurred in IM's trading account.

The contentions of IM are extremely numerous, but, so far as the court can determine, they are without legal merit. IM's claims fall basically into four different groups. It alleges breach of contract and conversion, fraud, negligence, and violation of regulatory statutes.

### A. *Claims of Breach of Contract and Conversion.*

■ 1. IM's principal claim is that it had a contractual agreement with BBL that its losses would be limited to $50,000. (It contends that the loss limit was initially set at $40,000 and later increased to $50,000.) I find as a matter of fact that there was no such contractual understanding. IM has failed to demonstrate that BBL entered into such an agreement with it. It may well be that, around the time of IM's first discussions with Willie Reporter, there was some talk of an attempt to limit its losses in this fashion. But, there was no contractual commitment to do so.

The evidence makes it highly doubtful that this claim is even advanced in good faith. IM was intimately aware on a daily basis of the results of all of the trading done for its account. In the first period of trading through June, 1989, the losses in its account exceeded the alleged $40,000 loss limit by more than six times. IM nonetheless continued the trading program placing many millions of dollars at risk and sometimes realizing losses far in excess of the alleged limit on a single day. IM therefore cannot have thought it was operating under a loss limit unless it believed that the bank was absorbing all the losses itself. IM's contention that it did indeed have that belief is contradicted by its own memorandum of the discussions with BBL at the January 8, 1990 meeting. Michael Stock's memorandum of this meeting reflects the fact that the aggregate marked-to-market loss of $1.8 million dollars resulted in IM's exceeding its line of credit of $1½ million dollars. At no point during the meeting did IM protest that the loss was to be borne by the bank to the extent that it exceeded $50,000, nor do the notes of the meeting reflect any mention of a loss limit. Furthermore, the notion that the bank was offering its customer that it would trade speculatively in large volumes of foreign currencies under the understanding that profits would belong to the customer and that losses (in excess of $50,000) would be absorbed by the bank is so unlikely as to be preposterous.

■ 2. IM contends that on January 8, 1990, BBL undertook a contractual obligation to maintain IM's large short position in deutsche marks, that its failure to do so breached this obligation and prevented IM from converting its large loss into $100,000 profit on January 22. This contention is

completely without justification or support. Of course, in retrospect, it would be nice if BBL had maintained the short deutsche mark position. But the contention that BBL had a contractual obligation to do so is without any justification. IM has failed to prove it. It would have been inexplicably silly, furthermore, for BBL to enter into any such agreement. The large speculative position had moved against IM consistently for some time, producing the $1.8 million dollar aggregate deficit on January 8. If BBL had committed itself contractually to stick with this short position of DM 80,000,000, and the deutsche mark had continued to strengthen, the losses would soon have far exceeded any conceivable ability of IM to pay. BBL may well have expressed a present intention at the January 8 meeting to stick with the position. But even if it did, it had no contractual obligation to adhere to that intention.

Even more outlandish is the proposition that BBL's commitment required it to maintain the short deutsche mark position until exactly January 22, the most favorable moment, and liquidate it at that time so that IM would have realized a $100,000 profit. This is nothing more than an exercise in hindsight. It has no merit whatsoever.

As finder of fact, I find that, while BBL may have spoken on January 8 of the desirability of maintaining the short DM position, it made no contractual commitment to do so.

Furthermore, IM misrepresents the situation in arguing that BBL prevented it from continuing its speculation against the deutsche mark. If IM wished to continue to bet against the deutsche mark after January 9 when BBL closed out the position, it was entirely free to do so. It could have established a short position of DM 80 million with any other institution. BBL did not prevent IM from so speculating. All BBL did was to refuse to continue its 100% financing of a $50 million speculation.

**3.** Even if the posting had been to collateralize IM's losses, that would not entitle IM to the

■ 3. IM alleges that BBL has converted $300,000 that IM posted on January 8, 1990. IM contends that its transfer of this $300,000 amount was intended as collateral against exposure of its foreign exchange positions and not as a credit against its overdraft. The evidence completely contradicts this contention. IM's own memorandum of the January 8 meeting reflects that BBL's "biggest concern was that we were now exceeding our line of USD1.5 million for FX cover.... We agreed to wire transfer USD300,000 to BBL as a show of continuing good faith. This amount would bring us under our line of USD1.5 million." IM's Proposed Findings of Fact, Tab 137. Thus IM's own memorandum makes clear that the purpose of the $300,000 was to reduce the credit extended by BBL to IM.[3]

B. *Allegations of Fraud and Breach of Fiduciary Duty.*

IM makes numerous allegations of fraud and breach of fiduciary duty. It contends that BBL overstated the skill and expertise of its traders, failed to disclose the risks of foreign exchange trading, failed to disclose its fee and compensation structure, and failed to disclose that it was acting as a principal counterparty to IM in many of IM's trades.

■ With respect to the expertise of the traders, IM has shown nothing worse than permissible puffing.

■ As to failure to disclose the risks of such speculation, there are at least two deficiencies in IM's argument. First, it has not shown that BBL was under a duty to advise IM of risks. Second, the evidence shows that IM was well aware of the risks. Traub was an experienced businessman. Although he had no experience in foreign exchange trading before February 1988, he was aware of the risk of fluctuations in foreign currency well before he began this speculative trading. Indeed, his first foreign exchange transaction with BBL, a hedge transaction, was motivated by

return as the losses far exceeded $300,000.

Traub's desire to avoid that risk. IM had earned a $300,000 profit, payable in the future in deutsche marks. IM's profit was therefore exposed to the risk that the U.S. dollar might rise against the deutsche mark before payment was received. IM made its first transaction in awareness of such risk in order to avoid the risk. The trading it undertook thereafter was equally motivated by awareness of the risks of fluctuation of foreign currencies but now seeking to profit from that risk. From February to June 1989, IM lost $237,000 in foreign exchange trading. From June to November 1989, it made profits of over $500,000 in speculative foreign exchange trading. It can have been no secret to him that where one can earn $500,000 in speculative trading, one can as easily lose it. IM's withdrawal of more than $200,000 of such trading profits eloquently punctuated its awareness of the speculative nature of its activity. By the time IM entered the disastrous phase of its foreign exchange trading, it had already experienced nearly a year of active trading in which it had experienced big losses and had pocketed big profits. It was well educated in the risks. When IM was risking $50,000,000 positions in foreign currency fluctuation, it needed no instruction from the bank to know that the results could be bad.

As to the failure to disclose the fee and commission basis, there is no showing that IM ever asked, or was ever given misleading information.

■ The only contention that has a small semblance of merit involves BBL's failure to disclose that it was acting as a principal in buying from and selling to IM in the transactions which BBL was conducting on a discretionary basis for IM's account. It is an unhealthy arrangement for an agent to act also as undisclosed principal on the other side of transactions with its principal, especially when the transaction is created at the discretion of the agent. This arrangement is fraught with conflict of interest and with the risk that the agency transactions will be motivated to benefit the agent in its role as principal. Such a dual role is forbidden, at least without disclosure, in many forms of regulated trading, see, e.g., 15 U.S.C. § 78k(d) (1984); 17 C.F.R. § 240.15c1-6 (1982); In re Scientific Control Corp. Securities Litigation, 71 F.R.D. 491 (S.D.N.Y.1976), as well as in certain fiduciary arrangements. It is not, however, inherently fraudulent. IM has not shown that BBL's trading strategy (for its own account) in any way influenced any of the positions taken for IM by Willie Reporter or Robert Lostal, nor that any of IM's trades were motivated by BBL's desire to serve the interests of BBL as counterparty, nor that the rates at which the transactions were made for IM's account were less favorable than the rates that could have been obtained from another market-maker. IM has failed to show that there was any fraud involved in this arrangement.[4]

C. *Negligence.*

■ IM claims that BBL acted negligently in carrying and supervising the trading activity done for its account. Although that it is true without question that BBL had a duty to exercise reasonable skill and care in carrying out its activities for its customer, IM has failed to show a breach of the requirements of reasonable care and skill. There is, of course, no obligation under law to be successful in speculation. Although IM shows that at times certain superiors were not always aware of the details of the handling of the account by the trader, that does not necessarily consti-

---

**4.** IM points out that while BBL was losing money for IM, it was earning money in its own speculative foreign exchange trading. IM suggests this demonstrates that BBL was taking positions for IM to benefit itself, rather than to benefit IM. It has proved no such thing. Willie Reporter who was trading IM's account was not making BBL's trading decisions for its own account, nor is there any showing that he was influenced by those who were. It is not even shown that BBL earned net profits from trading in the *same* foreign currencies as produced losses for IM in the same period; nor that, in any period as to any particular currency, BBL's trading strategy for its own account differed from the strategy that its trader implemented for IM. IM has failed to show fraud, bad faith or breach of fiduciary responsibility in BBL's guidance of the trading strategy for IM's account.

tute negligence. IM has failed to show lack of reasonable skill or care.

### D. Failure to comply with regulatory requirements.

■ IM alleges that BBL violated the law by failing to conform to the requirements to the Commodities Exchange Act and the regulations promulgated under it. In these contentions IM misconceives the scope of the Commodities Exchange Act, which (at least as to foreign currencies, if not other commodities as well) regulates the market for *futures* contracts, but not the market in current transactions.

Section 4 of the Act makes it "unlawful for any person ... to enter into ... any transaction in ... a contract for the purchase or sale of a commodity *for future delivery* ...," 7 U.S.C. § 6(a) (1983) (emphasis added) unless it is done on an exchange ["board of trade"] supervised by the Commodity Futures Trading Commission ("CFTC") through a "member" and in a manner that complies with the statute and the rules promulgated by the CFTC. The word "commodity" is defined in Section 2 to mean "wheat, cotton, rice ... [etc] and all other goods ... services, rights, and interests in which *contracts for future delivery* are presently or in the future dealt in...." 7 U.S.C. § 2 (1983) (emphasis added). A special exemption in § 2 known as the Treasury Amendment provides "Nothing in this chapter shall be deemed to govern or in any way be applicable to transactions in foreign currency [or a variety of financial instruments] unless such transactions involve the sale thereof *for future delivery*...." *Id.* (emphasis added).

The transactions which BBL engaged in for IM's account were in all cases transactions in the "spot" market. The spot market is essentially the current market, as opposed to the markets for future delivery. *See* Munn, Encyclopedia of Banking & Finance 885 (1983 ed.) ("spot: ... trading for immediate, as distinguished from future, delivery...."); Rosenberg, Dictionary of Banking & Finance 470 (1982 ed.) ("spot exchange transaction: a purchase or sale of foreign currency for ready delivery. In practice, market usage normally prescribes settlement within two working days."). In the conventions of foreign currency trading, spot transactions ordinarily call for settlement in two days. *See* CFTC Report at 124 ("spot transactions [in foreign currencies] are usually settled within two business days."). Trading in foreign currencies on a spot basis is not deemed to come within the coverage of the Commodities Exchange Act, as that coverage applies only to futures. *See Commodities Futures Trading Commission v. American Board of Trade*, 473 F.Supp. 1177 (S.D.N.Y.1979), *aff'd*, 803 F.2d 1242 (2d Cir. 1986). Indeed, the CFTC recognizes that most foreign exchange trading is executed in the interbank spot market and not on exchanges subject to CFTC regulation. *See* CFTC Report at 124–127.

IM makes numerous contentions in an effort to overcome the inapplicability of the Commodities Exchange Act to the spot market for foreign currencies.

First, IM contends that because BBL would roll over IM's positions, buying one spot contract after another, thus perpetuating the speculation on a currency over a more extended period of time than contemplated by a single spot transaction, this trading should be deemed to be trading in futures contracts under the coverage of the Commodities Exchange Act.[5] The argument is misconceived. The Act does not purport to cover all speculation in foreign currencies that is extended over a substan-

---

**5.** IM has not argued that a spot contract falls within the coverage of the Act because settlement two days in the future is technically "future delivery." Such an argument, although technically defensible, seems to be outside the understandings by the CFTC and the trading world. Two days in the future surely is in the "future." If a contract called for settlement in one hour, that too would be technically in the "future." It appears, however, that two-day settlement is regarded as the earliest settlement that is reasonably practicable in a current market for foreign currency. It seems universally agreed that a sale in the spot market with a two-day settlement is not a "sale ... for future delivery" within the meaning of the Act. The CFTC has never asserted jurisdiction over the huge spot market.

tial period of time. It covers futures contracts. One can, of course, speculate in a foreign currency over a lengthy period simply by establishing a position in that currency and maintaining that position for as long as one wishes to speculate before converting it back to U.S. dollars, or by contracting that future payments due for goods or services be made in a designated foreign currency. If the foreign currency strengthens in relation to the U.S. dollar in the meantime, one will have profited; if it weakens, one will have lost. Such transactions would not fall within the regulation of the Commodities Exchange Act, notwithstanding that they involved long-term speculation in a foreign currency, because they would not involve contracts for futures. Here, although BBL maintained IM's speculative positions for substantial periods, at no moment did BBL establish a speculative position calling for future delivery beyond the two day terms of the current "spot" market. BBL never purchased a futures contract for IM.

Second, IM argues that because its contracts were made solely for speculation, without intention ever to take delivery of the purchased commodity, this trading should be deemed to come within the coverage of, rather than the exclusion from, the Commodities Exchange Act. IM cites language from various CFTC interpretive opinions and court decisions which it contends support its position.

The argument is misplaced. With respect to the distinction between the current market and futures transactions, the Act, as noted above, simply limits its coverage and the CFTC's jurisdiction to futures. It does not cover the spot market, regardless of the motivation of the transactions.

The language of the CFTC and court opinions cited by IM is addressed to a different problem. After the sentence of the Treasury Amendment stating that the Act shall not apply to foreign currency transactions "unless for future delivery," the next sentence goes on to provide a *further* limitation:

> The term 'future delivery' ... shall not include any sale of any cash commodity for deferred shipment or delivery. 7 U.S.C. § 2 (1983).

This limitation was initially enacted to permit farmers to sell their grain for future delivery, free of the regulations created by the statute (and its predecessors). It essentially provides that *notwithstanding provision for future delivery*, the commodity contract will nonetheless be outside the reach of the Act if it falls in the category of the "sale of a cash commodity for deferred shipment on delivery." How to distinguish futures contracts (that are covered) from sales of cash commodities for deferred delivery (that are not) has been difficult. It is in this context that the Commission and the courts have fashioned the standards that IM cites. They have opined to the effect that the cash commodity/deferred delivery exclusion is designed for purchasers that *utilize the commodity* in their business and therefore expect to take delivery of the commodity to provide for business needs, as distinguished from purchasers who have no expectation of taking delivery of the commodity in the future, but are merely engaged in a speculation on price change, intending to conclude the transaction by an offsetting transaction rather than by delivery. *See Commodity Futures Trading Commission v. Co Petro Marketing Group*, 680 F.2d 573 (9th Cir. 1982); *NRT Metals v. Manhattan Metals (Non–Ferrous) Ltd.*, 576 F.Supp. 1046 (S.D.N.Y.1983); *CFTC v. National Coal Exchange*, [1980–1982 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,424 at 26,046 (W.D.Tenn.1982); *In the Matter of First National Monetary Corp.*, [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,698 at 30,970 (C.F.T.C.1985); *In re Stovall*, [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,941 at 23,775 (C.F.T.C.1979); CFTC, Statutory Interpretation Concerning Forward Transactions, 55 Fed.Reg. 39188 (1990); *see also* Russo, *Regulation of the Commodities Futures and Options Markets*, § 9.801, at 9–2 (1983).

Thus the discussions cited by IM referring to price speculation as opposed to an intention to take actual delivery of the com-

modity are not addressed to the distinction between transactions in the current (spot) foreign currency market (not covered) and transactions in futures (that are covered). They are addressed rather to the issue *in cases of future performance* between the *futures market* which is covered and contracts for deferred delivery to users which is not. The distinction is not pertinent in this case.

I agree with IM that if this were a case of contracts for future delivery, the factors suggested by courts and the CFTC would bring IM's trading within, rather than outside, the coverage of the Act. As IM's speculation was on the spot market, however, and not for future delivery, those factors do not control.

I note further that to rule in accordance with IM's argument would bring about an enormous upheaval in foreign exchange trading. As the CFTC's Report indicates, "Most [foreign exchange] trading is executed on the interbank market" and not on CFTC regulated exchanges. There is every reason to believe that large portions of such trading is speculative, with traders using rollovers to perpetuate positions and offsetting transactions to close them out, rather than taking delivery of foreign currencies. The CFTC Report makes no suggestion that such trading is illegal. If the ruling advocated by IM represented the law, this enormous market would be illegal for failure to conform to the requirements of Section 6.

■ Finally, IM contends that the exemption of spot trading in foreign currencies was intended by Congress to free the *interbank* market in foreign exchange from CFTC regulation. *See* CFTC, Statutory Interpretation and Request for Comments, Trading in Foreign Currencies for Future Delivery, 50 Fed.Reg. 42963 (1985); S.Rep. No. 1131, 93rd Cong., 2d Sess. 23, 31, 49–51 (1974); S.Conf.Rep. No. 1194, 93rd Cong., 2d Sess. 35 (1974), U.S.Code Cong. & Admin.News 1974, p. 5843. IM therefore contends the exemption should not be construed to extend to transactions where a bank acts for, or trades with, its non-bank customer, as distinct from a bank-to-bank transaction. IM supports this argument by *selective* reference to statements of the CFTC. When read with care in the full context, however, these references do not support IM's position. For example, IM seeks support from the selective language of the CFTC's Statutory Interpretation, 50 Fed.Reg. 42963 (1985). It is true that in this statement the CFTC asserts that the exclusion

> "is not applicable when such transactions involve members of the general public" and that the Treasury Amendment "applies only when such transactions are entered into by and between banks and certain other sophisticated and informed institutional participants.... In this regard, the Commission has repeatedly asserted and the courts have uniformly agreed that the Treasury Amendment cannot be read so as to place outside the Commission's jurisdiction the marketing of such off-exchange foreign currency transactions; instead, the Amendment was meant to encompass only transactions among and between banks and other sophisticated, informed institutions." *Id.* at 42964.

It is clear *in the context*, however, that the statements quoted above refer to the Treasury Amendment's "exclusion from the Commission's exclusive jurisdiction over transactions involving contracts of sale of a commodity *for future delivery* ("*futures contracts*")...." (Emphasis added.) Repeatedly throughout this interpretative release, the Commission is asserting its jurisdiction only with respect to futures contracts. For example in the interpretative release, the CFTC asserts that "[A]ny off-exchange offer or sale to the general public of transactions involving foreign currency *futures* contracts is unlawful...." 50 Fed.Reg. at 42964. It refers to "the Commission's exclusive jurisdiction over *futures contracts*". *See id.* at 42963–4. And in a CFTC no-action letter issued Re: *Services Inc.—X,* Oct. 9, 1991, the Commission made clear as to services being offered to facilitate transactions in the *spot* foreign currency markets, the staff would not recommend action, on the

condition that the operation be "strictly limited to facilitating *spot* foreign currency transactions" (emphasis added). Similarly in the case of *CFTC v. Co Petro*, 680 F.2d 573 (9th Cir.1982), where the defendant was engaged in trading in both the spot and the futures market, the CFTC took enforcement action only with respect to the futures trading, and not as to the spot trading. *See id.* at 576.

In any event, even if it is correct that Congress' *motivation* in exempting foreign exchange transactions, "unless ... for future delivery," was to exempt interbank trading, as opposed to brokerage transactions or transactions between bank and customer, statutory history of this nature cannot be a substitute for express terms of the statute. The statute unmistakeably exempts foreign currency transactions "unless for future delivery." It makes no reference whatever to the distinction IM seeks to advocate. At least absent regulations specifying such a distinction, a court may not properly engraft such distinctions on an express and unambiguous limitation.

### Conclusion

The court finds that plaintiff, Bank Brussels Lambert, S.A., has shown entitlement to judgment (in the amount of approximately $1,500,000 plus interest), for the credit it extended to defendant, Intermetals Corporation, to finance the losses incurred in Intermetals' foreign exchange trading. The court finds that the affirmative defenses and counterclaims asserted by Intermetals are without merit.

SO ORDERED.