**COMMODITY FUTURES TRADING COMMISSION, Plaintiff,**

v.

**INTERNATIONAL FOREIGN CURRENCY, INC., a New York Corporation, dba International Foreign Currency Exchange, dba I.F.C. Trading, Inc., Thomas Qualls, an individual and Michael Kourmolis, an individual, Defendants.**

No. CV–03–3577 (TCP)(ARL).

United States District Court, E.D. New York.

Sept. 3, 2004.

Erin E. Powell, James H. Holl, III, Washington, DC, for Plaintiff.

Bruce Smirti, Garden City, Paul W. Thorpe, Jr., Rebore, Thorpe & Pisarello, P.C., Farmingdale, NY, for Defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Before this Court are motions brought by International Foreign Currency, Inc.

("IFC"), Thomas Qualls ("Qualls") and Michael Kourmolis ("Kourmalis"), (collectively "Defendants"), to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction, and 12(b)(6), for failure to state a claim, the action commenced by the Commodities Futures Trading Commission ("CFTC" or "Plaintiff").

For the following reasons, Defendants' motions are **DENIED**.

## BACKGROUND

### A. Factual History

The CFTC brought suit against Defendants pursuant to the Commodity Exchange Act ("CEA") as amended by the Commodity Futures Modernization Act ("CFMA"). Defendant Qualls is the President of IFC, and Kourmalis "has identified himself variously as a 'Senior Account Executive' and as 'Vice President of Accounts' for IFC." (Compl. at ¶¶ 9–10). The CFTC alleges that from November 27, 2001 until at least July 11, 2003, Defendants offered and sold foreign currency futures contracts over the phone to the retail public out of the IFC office in Garden City, New York. (Compl. at ¶ 11).

In the course of his solicitations, Defendant Kourmolis allegedly explained to at least one customer, Mrs. Blakers, that she would have an individual bank account with IFC and that Chase Manhattan Bank would insure the account for up to twenty-five million dollars. (Compl. at ¶ 13). Mrs. Blakers subsequently wired approximately $10,000 to IFC and Kourmalis sent her a written "Confirmation of Funds Transfer," stating that IFC had opened a

personal account in her name and would begin trading on her behalf. (Compl. at ¶¶ 13–14); (Pl.Exh.12).[1]

According to the complaint and Plaintiff's accompanying exhibits, however, Mrs. Blakers' money was neither deposited into an individual bank account nor transferred to IG Index, a London company, which Defendants allege executed the foreign currency transactions for IFC. (Compl. at ¶ 18); (Qualls Aff. at 1–2). Instead, Mrs. Blakers' funds were deposited into one account, Qualls' personal account, and were apparently used to pay for his personal expenses. (*Id.*).[2] Her funds were also not insured by Chase Manhattan Bank and when Mrs. Blakers later attempted to close out her account, IFC ceased communication with her, and to date, has not returned any of her funds. (Compl. at ¶¶ 13–18).

CFTC filed suit on July 23, 2003, alleging violations of § 4(a), § 4(b)(a)(2)(i) § 4(b)(a)(2)(iii) of the CEA, in addition to § 1.1(b) of the Commission Regulations. (Compl. at ¶¶ 3–5). Defendants subsequently filed the instant motions and oral argument was heard on March 19, 2004.

## DISCUSSION

### A. Standard of Review

#### i. Fed.R.Civ.P. 12(b)(1)

When considering a motion to dismiss for lack of subject matter jurisdiction, a court may look at materials other than the pleadings to decide the jurisdictional question. *Sharp v. Bivona*, 304 F.Supp.2d 357, 362 (E.D.N.Y.2004)(citing *Robinson v. Gov't of Malaysia*, 269 F.3d

[1] All Plaintiff's exhibits referred to herein are taken from earlier motion papers, specifically, the Memorandum of Points and Authorities in Support of Plaintiff's Motion for an *Ex Parte* Statutory Restraining Order and other Equitable Relief, filed on July 23, 2003.

[2] According to Plaintiff, Defendant Qualls used some of the money for "two purchases while on a Royal Caribbean Cruise, restaurant charges, gasoline purchases, and a purchase at Walmart, Inc." (Compl. at ¶ 18; *see also* Pl. Exh. Q).

133, 141 n. 6 (2d Cir.2001)). The Court must accept all facts alleged in the complaint as true but the Court may not make inferences in favor of the party asserting jurisdiction. *Smith v. Barnhart*, 293 F.Supp.2d 252, 254 (E.D.N.Y.2003). While the party invoking the jurisdiction of the Court has the burden of proof, "dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Fortress Bible Church v. Feiner*, No. 03–4235, 2004 WL 1179307, at *1, 2004 U.S. Dist. LEXIS 9614, at *3 (S.D.N.Y. March 29, 2004)(citing *Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 68 (2d Cir.2000)).

### ii. Fed.R.Civ.P. 12(b)(6)

When considering a motion to dismiss for failure to state a claim, the Court "must 'accept all of the plaintiff's factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Bivona*, 304 F.Supp.2d at 362 (quoting *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir.1999)). The motion should be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Formica v. Town of Huntington*, 104 F.3d 350, 1996 WL 688451, at *1 (2d Cir.1996) (citation omitted).

## B. The CEA as Amended by the CFMA

The purpose of the CFMA was to "clarify the jurisdiction of the Futures Trading Commission on certain retail foreign exchange transactions...." CFMA, Pub. No. 106–554, 114 Stat 2763A–376 (2000). The CFMA added the following to § 2 of the CEA, which now states in pertinent part:

**(c) Agreements, contracts, and transactions in foreign currency, government securities, and certain other commodities.**

(1) In general. Except as provided in paragraph (2), nothing in this Act [*7 USCS §§ 1* et seq.] ... governs or applies to an agreement, contract or transaction in-

(A) foreign currency ...

**(2) Commission Jurisdiction**

(A) Agreements, contracts and transactions traded on an organized exchange. This Act [*7 USCS §§ 1* et seq.] applies to, and the Commission shall have jurisdiction over, an agreement, contract or transaction described in paragraph (1) that is-

(i) a contract of sale of a commodity for future delivery ... that is executed or traded on an organized exchange ...

**(B) Agreements contracts and transactions in retail foreign currency. This Act [*7 USCS §§ 1* et seq.] applies to, and the Commission shall have jurisdiction over, an agreement, contract, or transaction in foreign currency that-**

**(i) is a contract of a sale of a commodity for future delivery ... and ...**

**(ii) is offered to, or entered into with, a person that is not an eligible contract participant,[3] unless the counterparty, or the person offering to be the counterparty, of the person is [an exempted counterparty]**

---

**3.** Defendants do not contest that at least one customer was not an eligible contract partici-

. . . [4]

7 U.S.C. § 2(c) (2004) (emphasis added).

In addition, Congress also amended the CEA by deleting the Treasury Amendment. *See* 7 U.S.C. § 2 (2004) (noting amendment on Dec. 21, 2000, which deleted exemption for transactions in foreign currency unless such transactions were for future delivery and conducted on a board of trade).

## C. Defendants' Motions to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1)

### i. IFC's and Qualls' Arguments

■ Defendants IFC and Qualls allege the following arguments in support of the instant motion: (a) Defendants created "spot" foreign currency contracts with customers rather than the futures contracts that are regulated by the CFTC pursuant to the CEA; (b) currency is not a commodity; (c) Defendants are exempt from the CEA because they did not transact in foreign currency on a "board of trade"; (d) Defendants are exempt from CFTC jurisdiction pursuant to § 2(c)(2)(B)(ii) of the CEA because the counterparty in this case, IG Index, is an exempted financial institution; and (e) Defendants are not subject to the jurisdiction of the Court because IFC did not conduct transactions in the United States. (Defs. Mem. of Law at 2–6). The Court will address each of Defendants' arguments in turn.[5]

### a. What Constitutes a Futures Contract?

■ In order to fall within the purview of the CEA, Defendants must have transacted in contracts "for future delivery," ("futures contracts"). *See* 7 U.S.C. § 2(c)(2)(B)(i). Futures contracts are contracts that are bought or sold at a specified price and fixed quantity for future delivery. *Commodity Futures Trading Comm'n v. Standard Forex, Inc.*, No. 93–0088, 1996 WL 435440, at *1, 1996 U.S. Dist. LEXIS 14778, at *2 (E.D.N.Y July 25, 1996), (hereinafter *"Standard Forex II"*). Although there is no precise definition as to what constitutes a futures contract, courts have distilled from case law and regulatory authorities the following important elements: (i) "an obligation to make or take delivery of a commodity in the future;" (ii) "an ability to offset the putative obligation to make or take delivery and thus realize a gain or loss on the intervening price fluctuation;" (iii) a purpose to speculate on the intervening price changes without actually having to acquire the underlying commodity;" (iv) standardization of contract terms; and, (v) a margin system of investing. *Standard Forex II*, 1996 WL 435440, at *10, 1996 U.S. Dist. LEXIS 14778, at *30–1; *Commodity Futures Trading Comm'n v. Int'l Fin. Serv., Inc.*, 323 F.Supp.2d 482, 494 (S.D.N.Y. 2004), (hereinafter *"Int'l Fin. Serv"*).

pant within the meaning of the CEA.

4. Exempt counterparties may include a financial institution, a broker or dealer registered under the Securities Exchange Act ("SEA"), a futures commission merchant registered under the CEA, an insurance company, an investment bank holding company as defined by the SEA, or a financial holding company. 7 U.S.C. § 2(c)(2)(B)(ii).

5. In addition, Defendants argue that even after the passage of the CFMA, the Court does not have jurisdiction as clearly expressed by

§ 2(i)(2) of the CEA. (Defs. Mem. of Law at 5–6). Defendants, however, simply offer no evidence in support of this argument. Further, a reading of § 2(i)(2) in the way IFC suggests would render all CFMA additions to the CEA superfluous and the Court will not interpret one part of the CEA as to render another part inoperative. *See Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985)(quoting *Colautti v. Franklin*, 439 U.S. 379, 392, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979)).

In *Int'l Fin. Serv.*, a recent case in the Southern District of New York, the court found that a purported foreign currency trading firm transacted in foreign currency futures contracts. *Id.* at 498. The similarities between that case and the instant action are particularly illustrative, and the Court finds that the contracts at issue meet most, if not all, of the important elements of a futures contract.

First, as in *Int'l. Fin. Serv.*, IFC's customers did not have the intention to take delivery of the foreign currencies, rather, IFC settled, (or at least purported to settle), the contracts by entering into offsetting transactions. *Id.* at 494. Therefore, customers gained or lost money based on fluctuations in the currencies' values. *Id.* Mrs. Blakers' monthly account statements show that no currency was delivered, rather the currency was sold, offsetting the original contract, and thus establishing a gain or loss that depended on the change in value of the underlying currency. (Pl. Exh.14). In addition, Defendants concede that there was never any physical delivery of the currency and IFC's documents contain no provision which anticipates customers taking delivery of the foreign currencies they allegedly purchase. (Qualls Aff. at 3); (Compl. at ¶ 22). Accordingly, these facts tend to establish the second and third elements of a futures contract.

Second, IFC, like the firm in *Int'l. Fin. Serv.*, created contracts that called for the purchase or sale of standardized amounts of foreign currencies. *See* at 494–95. Here, as evidenced by the monthly account statements, all transactions entered into on behalf of Mrs Blakers were in the amount of $100,000. (Pl.Exh.14). In addition, IFC standardized the terms and conditions of the contracts in the customer agreement forms. (Compl. at 23; Pl. Exh. 9). Accordingly, the fourth element of a futures contract is satisfied.

Lastly, as in *Int'l. Fin. Serv.*, IFC allowed customers to contract on margin. *Id.* at 494. Mrs. Blakers' monthly account statements from IFC show multiple foreign currency transactions of $100,000, but her actual investment with IFC was only for $10,000. (Pl.Exh.Q, 14). Therefore, the foreign currency transactions purportedly conducted on her behalf were purchased on margin, establishing the fifth element of a futures contract. *See Commodity Futures Trading Comm'n. v. Noble Wealth Data Information Serv., Inc.*, 90 F.Supp.2d 676, 682 (D.Md.2000) *vacated in part on other grounds*, 278 F.3d 319, 329 (4th Cir.2002) (Investors purchased contracts on margin when they made a down payment of $1,000 for a contract to be traded in increments of $100,000).

Defendants argue, however, that they never traded in futures contracts because all of their contracts were traded on the "spot market," and there was no set delivery date made at the time of the transaction. Both of these arguments fail.

First, in order to be a "spot contract," the contract must call for settlement within two days. *Bank Brussels Lambert, S.A. v. Intermetals Corp.*, 779 F.Supp. 741, 742 (S.D.N.Y.1991). Defendants' contracts do not meet this requirement because there was no delivery date specified and thus, the contracts could be held indefinitely. (Qualls Aff. at 2). Although IFC argues that the two day requirement is not a determinative element to the "spot contract," all authority is to the contrary. *See Bank Brussels*, 779 F.Supp. at 742; *see also* Standard *Forex II*, 1996 WL 435440, at *11, 1996 U.S. Dist. LEXIS 14778, at *32; *Commodity Futures Trading Comm'n v. Zelener*, 373 F.3d 861, 869 (7th Cir.2004); *Int'l. Fin. Serv.*, at 495; *Noble Wealth*, 90 F.Supp.2d at 689. Further, even if the contract was to be extended beyond a two day period

via "rollovers," a spot contract must still call for settlement every two days. *See Bank Brussels,* 779 F.Supp. at 743; *Standard Forex II,* 1996 WL 435440, at *11, 1996 U.S. Dist. LEXIS 14778, at *36; *Int'l. Fin. Serv.,* at 497.

Second, the fact that Defendants' contracts failed to have a specified future delivery date is not determinative. "While futures contracts generally have a specified future delivery date ... that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'" *Standard Forex II,* 1996 WL 435440, at *10, 1996 U.S. Dist. LEXIS 14778, at *29 (quoting *Chicago Mercantile Exchange v. S.E.C.,* 883 F.2d 537, 546 (7th Cir.1989)); *Int'l Fin. Serv.,* at 497.

Thus, viewing IFC's transactions "as a whole with a critical eye toward [the] underlying purpose," the Court finds sufficient evidence that the contracts at issue are futures contracts. *Standard Forex II,* 1996 WL 435440, at *10, 1996 U.S. Dist. LEXIS 14778, at *30.

#### b. Is Foreign Currency a Commodity?

■ For purposes of jurisdiction under CEA § 2(c)(2)(B)(i), not only do the contracts entered into or solicited by Defendants need to be futures contracts, but each must involve the sale of a "commodity." *Id.* The CEA defines the term commodity as "wheat, cotton, rice ... and all other goods ... *and all services, rights, and interests* in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(4) (emphasis added). Defendants argue that because Title 7 of the United States Code which contains the CEA is entitled "agriculture," currency is not a commodity as defined therein. (Defs. Mem. of Law at 1).

■ The Court, however, rejects Defendants' argument and finds that consis-

tent with current case law in this Circuit, currency is a commodity as defined under the CEA. *See Commodity Futures Trading Comm'n v. Am. Bd. of Trade, Inc.,* 473 F.Supp. 1177, 1182 (S.D.N.Y.1979), *aff'd,* 803 F.2d 1242 (2d Cir.1986); *Standard Forex II,* 1996 WL 435440, at *9, 1996 U.S. Dist. LEXIS 14778, at *25; *Int'l Fin. Serv.,* 323 F.Supp.2d 482. Accordingly, the currency transactions that Defendants offered or entered into are contracts "of a sale of a commodity for future delivery," and fall within the purview of CEA 2(c)(2)(B)(i). *Id.*

#### c. Were the Transactions Conducted on a "board of trade"

■ Defendants argue that the Treasury Amendment, as interpreted by *Dunn v. Commodity Futures Trading Comm'n,* 519 U.S. 465, 469, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997), exempted all transactions in foreign currency unless such transactions were conducted on a "board of trade." *Id;* (Defs. Mem. of Law at 3–5). Although Congress subsequently amended the CEA by deleting the Treasury Amendment, Defendants argue that the foreign currency exemption found in *Dunn* is still in force, and accordingly, exempts the transactions in the instant action.

Even assuming, *arguendo,* that the Treasury Amendment maintains some vitality as interpreted in *Dunn,* the Court would still have jurisdiction over the instant action because IFC conducted transactions on "a board of trade." *See Commodity Futures Trading Comm'n v. Am. Bd. of Trade, Inc.,* 803 F.2d 1242, 1249 (2d Cir.1986); *Commodity Futures Trading Comm'n v. Standard Forex,* No. 93–0088, 1993 WL 809966, at *10–11, 1993 U.S. Dist. LEXIS 19909, at *31–3 (E.D.N.Y. Aug. 9, 1993), (hereinafter "*Standard Forex I*"). Although Defendants rely on the

holding in *Commodity Futures Trading Comm'n v. Frankwell Bullion Ltd.*, a Ninth Circuit decision, for its argument that Defendants did not conduct transactions on a "board of trade," this Court prefers instead to adhere to precedent within this Circuit on the issue. To that end, in *Am. Bd. of Trade,* the Second Circuit Court of Appeals concluded that the legislative history of the Treasury Amendment "belie[s] the notion that the [Treasury Amendment] was designed to exclude from regulation foreign currency options transactions such as those defendants engaged in with private individuals." 803 F.2d at 1249. The Court of Appeals went on to explain:

> [the legislative] history discloses that the exception was included in the [Act] at the behest of the Treasury Department on the ground that the protections of the Act were not needed for the sophisticated financial institutions, already subject to regulation, that participated in such transactions.

*Id.*

*Standard Forex I,* a subsequent case from the Eastern District of New York, elaborated on the *Am. Bd. of Trade* decision, holding that "the Treasury Amendment was intended to exempt only interbank transactions that were already regulated by the banking regulatory agencies." Other District Courts within this Circuit have reached the same conclusion. *See, e.g., Int'l Fin.* Serv., 492–93 ("the predominant view . . . holds that when Congress enacted the Treasury Amendment, limiting the CFTC's jurisdiction to currency transactions 'conducted on a board of trade,' it intended 'to exempt only interbank transactions that were already regulated by the banking regulatory agencies' "); *Rosner v. Peregrine Fin. Ltd,* No. 95–10904, 1998 U.S. Dist. LEXIS 7170, at *15 ("the Treasury

Amendment was not intended to exempt all 'off exchange' transactions from the CEA but only 'off exchange' interbank transactions because those transactions were already subject to government regulation"). Accordingly, as the transactions in the instant action were not interbank transactions, the Court finds that they were conducted on a "board of trade" and fall under the jurisdiction of the CEA.

### d. Is IG Index a Valid Counterparty Pursuant to CEA § 2(c)(2)(B)(ii)?

 Section 2(c)(2)(B)(ii) of the CEA does not confer jurisdiction over a transaction if one party is a valid financial institution. *Id.* Defendants argue that their transactions fall within this exemption because IG Index is a counterparty exempt from regulation under the CEA. (Tr. Oral Argument, March 19, 2004 at Pgs. 5–6). Defendants, however, fail to provide a single shred of evidence supporting IG Index's existence beyond gratuitous references to the supposed financial institution in its affidavits and memoranda of law. Plaintiff's exhibits, on the other hand, tend to cast serious doubts on the existence of IG Index. (Pl.Exh.14, Q). According to IFC's (i.e.Qualls') bank account records, after Mrs. Blakers wired money into the account, there was never any subsequent transfer of her funds to the phantom IG Index. (*See* Pl. Exh. Q). Instead, as explained *supra,* it appears that Qualls used the money for various personal purchases. Further, the account statements mailed by IFC to Mrs. Blakers do not identify any counterparty to the trades; the only firm named was IFC. (Pl. Exh. 14; Compl. at ¶ 16). Therefore, IG Index may not be deemed a valid counterparty and accordingly, IFC's transactions are not exempted.

### e. Defendants' Contacts in the United States

 Defendants argue that they are not subject to the jurisdiction of the Court because they did not conduct their transactions in the United States. Instead, Defendants contend that they conducted their transactions via IG Index in England and thus, are subject to regulation by the Securities Financial Authority in London. (Qualls Aff. at 1–2).

Defendants, again, simply offer no evidence to support this assertion or the fact that IG Index actually exists. Indeed, as explained *supra*, the evidence tends to show the opposite. Solicitation of at least one customer (Blakers) certainly occurred in the United States, from the IFC office in Garden City, New York. (Pl.Exh.12, 13, 14). Further, IFC is incorporated in the State of New York and money was wired by Blakers to IFC's bank account, located in Long Beach, New York. (Compl. at ¶¶ 3–11; Pl. Exh. Q). Accordingly, Defendants are subject to the jurisdiction of the Court.

In sum, the CFTC has met its jurisdictional burden by showing that the foreign currency transactions in the instant action were contracts "of a sale of a commodity for future delivery," as contemplated by CEA § 2(c)(2)(B)(i). Further, the transactions did not fall into any of the exemptions available under the CEA, and there are sufficient contacts in the United States, specifically, the Eastern District, to support the Court's jurisdiction. Therefore, Defendants' motion to dismiss pursuant to Fed. R. Civ. P 12(b)(1) for lack of subject matter jurisdiction is denied.

### ii. Kourmolis' arguments

 Kourmolis asserts that he is not subject to the Court's jurisdiction because the complaint fails to set forth any instances wherein he entered into any of the foreign currency transactions discussed *supra*. In addition, Defendant Kourmalis argues that the all the foreign currency transactions at issue occurred after his termination with IFC. (Thorpe Affirmation at 2–3).

Kourmolis, however, misinterprets the CEA to require *entering into* a transaction as the only predicate for jurisdiction. To the contrary, Section 2(c)(2)(B)(ii) of the CEA not only contemplates the execution of a sale of a commodity but also the *solicitation* of a sale. *See id.* The CEA states in relevant part that "the Commission has jurisdiction over an agreement, contract or transaction in foreign currency that . . . is *offered to*, or entered into with, a person that is not an eligible contract participant . . ." *Id* (emphasis added). Defendant concedes that he solicited customers on behalf of IFC, and accordingly, his conduct is sufficient to establish jurisdiction pursuant to CEA § 2(c)(2)(B)(ii). (Thorpe Affirm. at ¶ 6).

Further, Kourmolis was employed by IFC and solicited customers from February 2002 to approximately September 2002. (Thorpe Affirm. at ¶ 6). Although the purported transactions at issue allegedly occurred after Kourmalis left, as explained *supra*, his solicitations are sufficient to invoke jurisdiction under CEA § 2(c)(2)(B)(ii). Therefore, Defendant's motion to dismiss pursuant to Fed. R. 12(b)(1) is also denied.

### D. Defendants' Motions to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6)

Defendants' Rule 12(b)(6) motions are also denied because the motions involve the same issues already decided in Defendants' Rule 12(b)(1) motions. Further, when analyzing a Rule 12(b)(6) motion, the Court must base its decision on the pleadings and take all facts alleged in the com-

plaint as true. *Bivona,* 304 F.Supp.2d at 362 (quoting *Desiderio v. National Ass'n of Sec. Dealers, Inc.,* 191 F.3d 198, 202 (2d Cir.1999)). Therefore, the Court denies Defendants' Rule 12(b)(6) motions.

### CONCLUSION

For the foregoing reasons, Defendants' Rule 12(b)(1) and Rule 12(b)(6) motions to dismiss are hereby **DENIED**.

SO ORDERED.