**COMMODITY FUTURES TRADING COMMISSION, Plaintiff,**

v.

**INTERNATIONAL FINANCIAL SERVICES (NEW YORK), INC.,** International Financial Services (New York), LLC, **John Walker Robinson,** and **Chan Kow Lai a/k/a Wilson Lai,** Defendants,

**Sociedade Comercial Siu Lap Limitada, Relief Defendant.**

**No. 02 Civ. 5497(GEL).**

United States District Court, S.D. New York.

May 7, 2004.

Christina J. Kang, Division of Enforcement, United States Commodity Futures Trading Commission, New York, N.Y. (Stephen J. Obie, Regional Counsel, Beth R. Morgenstern, Stephen Ringer, Linda Peng, on the brief), for Plaintiff.

Louis F. Burke, New York, NY, for Defendant International Financial Services (New York), LLC.

Ronald E. Kliegerman, New York, NY, for Defendant Chan Kow Lai a/k/a Wilson Lai.

## OPINION AND ORDER

LYNCH, District Judge.

The Commodity Futures Trading Commission ("Commission" or "CFTC") brought this action under the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, as amended by the Commodity Futures Modernization Act of 2000 ("CFMA"), Pub.L. No. 106–554, 114 Stat. 2763, alleging that defendants fraudulently and without authorization engaged in transactions in foreign currency futures contracts. Defendants International Financial Services (New York), Inc. ("IFS Inc.") and Sociedade Comercial Siu Lap Limitada ("Siu Lap"), which purportedly acted as, respectively, brokerage firm and clearinghouse for the orders, defaulted. The Commission now moves for summary judgment against the remaining defendants. It seeks permanently to enjoin them from violating the CEA and to recover, through the remedies of disgorgement, restitution, and statutory penalties, additional funds to compensate the victims of defendants' alleged fraud. Defendant International Financial Services (New York), LLC ("IFS LLC") cross-moves for summary judgment, arguing primarily that the Commission lacks jurisdiction under the Act, but also that IFS LLC cannot be held liable because, contrary to the Commission's allegations, it did not engage in a

common enterprise with IFS Inc. Defendant Chan Kow Lai (a/k/a Wilson Lai), an alleged controlling person of IFS Inc., joins in IFS LLC's jurisdictional objections and opposes the Commission's motion on the merits, while defendant John Walker Robinson, former president of IFS Inc., did not oppose the motion. For the reasons that follow, the Commission's motion will be granted and IFS LLC's cross-motion denied.[1]

## BACKGROUND

Because IFS Inc. defaulted and both Lai and Robinson invoked their Fifth Amendment privilege against self-incrimination at their depositions, few of the relevant facts can be disputed. Defendants must rely almost exclusively on the Commission's evidence in an effort to establish genuine issues of material fact sufficient to defeat summary judgment. The following recitation of facts is therefore drawn primarily from CFTC's Local Rule 56.1 Statement of Undisputed Material Facts. Alleged factual disputes will be appraised, where relevant, in the course of the discussion below.

### IFS Inc.

In 1997, Lai, a controlling shareholder of Frankwell Commodities Limited ("Frankwell"), a Hong Kong company, participated in the establishment of IFS Inc., a New York corporation with offices in Manhattan and Houston, Texas. (P. Rule 56.1 Stmt. ¶¶ 1, 51–52, 58; Kang Decl., Ex. ZZ at 4 & nn. 15–17.) IFS Inc. purported to be a currency trading brokerage firm, but it never registered with the Commission. (Id. ¶¶ 2–3.) Lai sat on IFS Inc.'s board of directors and, in that capacity, advised Robinson, its president and chief executive officer. (Id. 34, 54–56.) Robinson oversaw IFS Inc.'s operations, supervised its

employees, and handled customer complaints. (Id. ¶¶ 35–38, 41–42.)

By placing advertisements in the *New York Times* and foreign-language newspapers read by Chinese, Russian, and Korean immigrants, IFS Inc. recruited persons, whom it characterized as independent contractors ("ICs"), to act as foreign currency brokers, traders, and consultants. (Id. ¶¶ 71–74.) One of these advertisements, for example, which appeared in the *Russkaya Reklama*, a New York newspaper that caters to the Russian immigrant community, stated:

> INTERNATIONAL FINANCIAL SERVICES (NEW YORK) INC[.] American Company from Wall Street with 24 years experience on currency market needs smart, hard-working, energetic people for position as CURRENCY TRADER[.] Two weeks seminar about currency trading, two months paid training, wide opportunity to make money, flexible work schedule.

(Kang Decl., Ex. MM ¶ 4.) The advertisements indicated that applicants need not have prior trading experience, and few ICs hired by IFS Inc. did. (P. Rule 56.1 Stmt. ¶¶ 75–76.)

IFS Inc. grouped the ICs into divisions based on their ethnicities, which included Korean, Chinese, and Russian, and management encouraged the ICs to solicit customers, including friends and relatives, from their respective ethnic communities. (Id. ¶¶ 74, 78–80; Kang Decl., Ex. LL ¶ 20, Ex. MM ¶ 17.) Management gave the ICs solicitation and training materials, including brochures and scripts for telephone calls, which included a number of misleading or false statements. (P. Rule 56.1 Stmt. ¶¶ 81–82.) IFS Inc. falsely repre-

---

1. Lai and IFS LLC also move to withdraw certain admissions pursuant to Fed.R.Civ.P. 36(b). Those motions will be dealt with in the context of resolving the Commission's motion for summary judgment.

sented, for example, that it maintained "direct links to established networks in the Far East and Southeast Asia, the Middle East, Germany, Switzerland and the United States." (Kang Decl., Ex. OO, Tab 2 at 4; P. Rule 56.1 Stmt. ¶¶ 85–86.) A training manual supplied to the ICs also falsely represented that IFS Inc. executed and cleared currency trades through an affiliate of Frankwell (*id.* ¶ 86); in fact, Siu Lap, a company with "offices" in an apartment in a residential building in Macao, served as IFS Inc.'s exclusive broker. (*Id.* ¶¶ 88, 125; Kang Decl., Ex. WW.)

The solicitation materials, as well as oral representations made by the ICs at the direction or encouragement of IFS Inc.'s management, also misled prospective customers by representing that foreign currency trading offered a very high potential for returns and only a minimal risk of losses. IFS Inc.'s marketing brochure explained that

> [t]he main advantage of the FOREX [foreign exchange] market is that there is no bear market as such, in that it is possible to benefit from currency movements whether they increase or decrease in value, so during times of uncertainty and adverse economic conditions the Spot FOREX market offers great opportunity for enhancing portfolio returns.

(*Id.* ¶ 84.) In a similar vein, IFS Inc.'s sales and marketing manual instructed the ICs to inform prospective customers that making money was the "easy part" of their job. (*Id.* ¶ 90.) The same proposed marketing script stated that IFS Inc. would "never exspose [*sic*] more than 30% of the initial investment. The remaining principal stays in a segregated account at J.P. Morgan." (Kang Decl., Ex. NN, Tab F at 9.) There is no evidence that IFS Inc. even created any client accounts at J.P. Morgan.

Affidavits from former IFS Inc. customers establish that the ICs routinely misled and lied to customers about the prospect for profits and the status of their accounts. In almost every case, customers lost virtually their entire investments. (P. Rule 56.1 Stmt. ¶¶ 92–102.) One IC told a customer that she stood to gain as much as 600% on her initial investment. In fact, she lost her entire $40,000 investment. The same customer testified that IFS Inc. representatives did not give her adequate time to read her customer contract, which they characterized as "just a formality." (Kang Decl., Ex. PP ¶ 12.) Someone subsequently forged her initials on the first page of that contract. (*Id.* ¶ 14.) Another IC, Rene, told a customer, Karahan, that in the "worst-case scenario," he could lose no more than approximately $1000 of his initial $20,000 investment. When Karahan said he would like to take home and review the IFS Inc. contract, Rene told him not to delay, that the contract simply repeated what she had already explained to him, and that in view of favorable market conditions, he should sign it immediately so that she could begin to invest for him. Karahan lost virtually his entire life savings within ten weeks. (Kang Decl., Ex. OO.) Other affidavits from former ICs and customers of IFS Inc. establish that IFS Inc. falsely assured clients that trades would not be made without their express authorization, pressured them to sign account agreements without reading them carefully, refused to permit them to take those agreements out of IFS Inc.'s offices, and transacted with client funds without their authorization. (P. Rule 56.1 Stmt. ¶¶ 96–102.)

Robinson oversaw the daily operations of IFS Inc., supervised its employees, reviewed client accounts, and bore ultimate responsibility for handling customer complaints. (P. Rule 56.1 Stmt. ¶¶ 41–42, 145–

48.) Both IFS Inc.'s ICs and their clients complained to Robinson about the losses caused by IFS Inc.'s trading practices and made him aware that those practices inevitably would cause further losses. (*Id.* ¶¶ 149, 151–52; Kang Decl., Ex. LL at 9 ¶¶ 27–29.) But the ICs, and ultimately Robinson, would generally respond to customer complaints by telling them to add more money to their accounts. (P. Rule 56.1 Stmt. ¶ 153; Kang Decl., Ex. OO at 4 ¶ 17; Ex. SS at 3–4 ¶ 11; Ex. MM at 7 ¶ 27.)

Joseph Merlino, an expert retained by the court-appointed receiver, concluded that, in all, IFS Inc. lost $25,428,840 of the $32,810,454 that it invested for some 820 active customer accounts, or, "[v]iewed another way, a total of $178.89 was lost (risk) for each dollar of profit (reward)." (Kang Decl., Ex. TT at 5–6.) The Commission ascribes these gargantuan losses to the minimal and misguided training that ICs received and to IFS Inc.'s derelict trading practices, which Ezra Zask, an expert for the Commission, thoroughly documented and analyzed. (Kang Decl., Ex. UU ¶¶ 45–51.) New ICs sat through a brief training course in which they learned how to convert the values of foreign currencies into their U.S. dollar equivalents and the history of the foreign exchange market, as well as how to solicit customers, analyze the market (based primarily on charts showing market volatility), and place orders. (Kang Decl., Ex. LL ¶¶ 10–11.) They were also taught a hedging strategy whereby "[i]f a customer has a losing open position, the IC should open an equal, offsetting position in the same currency for the customer instead of closing out the original, losing position to minimize the loss." [2] (P. Rule 56.1 Stmt. ¶ 116.) Zask opines that this and other strategies encouraged by IFS Inc., "when executed by underqualified ICs, ... had the sole effect of diminishing the value of customer accounts while generating commission charges for IFS." (Kang Decl., Ex. UU ¶ 45.) Moreover, because IFS Inc. charged customers "a $90 commission per round-turn transaction," and because the ICs, in turn, "earned commissions based on the number of contract orders placed for customer accounts per month," the ICs had a strong incentive to place orders even when that would be contrary to their clients' interests. (P. Rule 56.1 Stmt. ¶¶ 112–13.) Indeed, Rosen, a former IC, testified that management threatened the ICs with demotion or discharge if they failed to generate adequate commissions for IFS Inc. (Kang Decl., Ex. D at 58.)

IFS Inc.'s trading procedures also made it virtually impossible for the ICs to make money for their clients. IFS Inc.'s dealing room assistants provided the ICs price quotes for foreign currencies futures contracts, and if the ICs decided to place an order, the assistants would confirm the purchase or sale of the contract with Siu Lap, IFS Inc.'s exclusive "clearinghouse." (P. Rule 56.1 Stmt. ¶¶ 105–06.) Because price quotes for the contracts received from the dealing room consistently differed from the market prices shown on a streaming Reuters ticker board, at times by as many as thirty to forty points, the dealing room quotes often made it impossible for the ICs to make a profit for their

---

2. According to the opinions of the Commission's experts, as summarized by the CFTC, this strategy "locks the customer into a loss. No matter what happens, one position's loss will offset any gain in the other. [A]ll that the strategy achieves, the elimination of further loss for the first open position, comes with the cost of another $90 commission charge to the account. The elimination of further losses, however, could be achieved simply by closing out the initial position at what would in effect be no additional cost." (P. Rule 56.1 Stmt. ¶ 117.)

customers. (*Id.* ¶¶ 106–07.) IFS Inc. also severely constrained the freedom of the ICs to place "limit orders," a device that enables traders to mitigate potential losses by placing an order to sell or buy automatically if a particular commodity falls below or exceeds a certain price. (*Id.* ¶ 109.) This rule compelled the ICs to place "market orders," that is, orders for immediate execution, which would be executed at the unfavorable prices quoted by the dealing room. (*Id.* ¶ 110.) Based on his analysis of the Commission's evidence, Zask concluded that IFS Inc.'s "structure did not comport to the standards of a legitimate foreign currency firm" and found "no evidence to refute the conclusion that IFS itself reaped the direct losses of the customer accounts, as its own profits." (Kang Decl., Ex. UU at 24 ¶ 61.) In fact, it is not clear that Siu Lap ever executed any of the purported orders placed on behalf of IFS Inc. clients.[3] (*Id.; see also* Kang Decl., Ex. W ¶¶ 78–80.; Ex. NN at 32.)

In effect, then, IFS Inc. required the ICs to "buy" and "sell" (purported) foreign currency futures contracts at artificially inflated prices provided by IFS Inc.'s dealing room, which, in turn, received its price quotes from Siu Lap, IFS Inc.'s purported clearinghouse. "[T]he exclusive relationship between Siu Lap and IFS left the clients captive to Siu Lap's pricing and rates, and placed the independent contractors and IFS' clients at a great disadvantage." (Kang Decl., Ex. NN at 51.) The ICs, moreover, made money exclusively through commissions generated by the trades, giving them perverse incentives to "buy" and "sell" at prices they knew would result in virtually certain losses for their customers. (*Id.* 20–28.) And IFS Inc. instructed its ICs to employ "illogical and overly risky" trading strategies that would have been disastrous even had IFS Inc. legitimately been clearing trades through Siu Lap. (Kang Decl., Ex. TT ¶ 45.)

But the fraud apparently ran even deeper. At bottom, IFS Inc. rigged the market to ensure that, with few exceptions, its customers would lose their money to itself and Siu Lap, to whom, "as a general matter, clients' money was wire-transferred." (Kang Decl., Ex. NN at 17.) Yet no evidence shows "that IFS or ... Siu Lap ... had dealing lines or accounts with any participants of the inter-bank foreign currency markets" (Kang Decl., Ex. TT ¶ 41) or "that the foreign currency contracts purportedly purchased and sold by IFS were ever laid off in any foreign currency, futures or inter-bank, market." (*Id.* ¶ 52.) Hence, "every dollar that was lost by a customer was a dollar gained by IFS" or its partner, Siu Lap. (*Id.* ¶ 61.) Siu Lap capitalized IFS Inc. and kept it solvent to enable IFS Inc. to continue to solicit client funds to be "invested" with Siu Lap. (Kang Decl., Ex. ZZ at 1–2, 4–6.) According to Merlino's analysis, as summarized by the court-appointed receiver,

IFS' reason for existence was to collect clients' funds, transfer the funds to Siu Lap in Macao, and purposely arrange to "lose" these funds in alleged currency trading. It is unlikely that clients' funds were actually traded. Since IFS and Siu Lap knew that clients' positions would be traded to result in losses, there were possibilities of large and apparently illegal gains to be made (in the amount of the alleged investments). These illegal gains would be made by only reporting the alleged trades on clients' statements, but not actually effecting these trades in the market, and,

---

**3.** The parties dispute whether IFS Inc.'s activities concerned "futures contracts" within the meaning of the CEA, vesting the Commission with jurisdiction. Facts relevant to this analysis will be set forth in connection with the discussion of jurisdiction below.

in the end, simply pocketing the clients' money.

(*Id.* 9–10.) In short, IFS Inc. apparently accepted thousands of dollars in client funds, issued them statements purportedly showing trading losses, and sent the money to an overseas account holder, Siu Lap, which may well have been no more than an entity that received the stolen funds. (Kang Decl., Exs. WW, ZZ.) [4]

*IFS LLC*

By letter dated April 6, 2001, Robinson was expressly advised that IFS Inc.'s failure to register with the Commission violated federal law. (Kang Decl., Ex. XX.) On February 12, 2002, Louis F. Burke, counsel for IFS Inc., wrote to the Commission to request that it take no action against IFS Inc. pending a contemplated restructuring and receipt of a decision on its application to register a new entity, IFS LLC, as a futures commission merchant ("FCM"). (P. Rule 56.1 Stmt. ¶ 10; Kang Decl., Ex. F, Tab 2.) The Commission refused to give IFS Inc. a "no action" letter because it failed timely to apply under the relevant laws. (P. Rule 56.1 Stmt. ¶ 6.)

On March 21, 2002, IFS LLC applied to the Commission to be registered as an FCM. (Kang Decl., Ex. G, Tab 2.) The application form represents that IFS LLC is a New York limited liability company, which maintains offices at 40 Wall Street in Manhattan, where IFS Inc. also has its offices; that IFS LLC's telephone number is the same as that of IFS Inc.; that IFS Inc. is a corporate principal of IFS LLC; and that Johnny Wah Jung, the owner of IFS LLC, is chairman of IFS Inc. (*Id.* 1, 3.) On page ten of the application form, Jung signed the form as "Chairman" of

IFS LLC. (*Id.* 10.) At his deposition, however, Jung testified that he had never before seen any part of the form except for page ten, and he denied the accuracy of much of the information contained in it, including IFS LLC's address, telephone number, and corporate affiliation to IFS Inc. (Jung Tr. 81–93.) Jung further testified that neither he nor IFS LLC had any business relationship with IFS Inc., Lai or Siu Lap (*id.* 37, 42, 63), though he conceded that IFS Inc. had deposited a $250,000 check into IFS LLC's bank account to help capitalize his company. (*Id.* 135–42.)

The Commission characterizes Jung's deposition testimony as "not credible" (P. Br.40) and offers substantial documentary evidence to establish that IFS Inc. and IFS LLC engaged in a common enterprise. First, by letter dated February 7, 2002, Robinson, acting for IFS Inc., wrote to Burke, counsel for IFS Inc., about the company's desire to register with the CFTC. The letter states in relevant part:

At this time we [IFS Inc.] need to establish the following LLC so that we can have the shareholder fund the necessary statutory capital prior to audit for application purposes:

INTERNATIONAL FINANCIAL SERVICE (NEW YORK), LLC

Johnny Jung will inject $250,000 into IFS with the balance of $160,000.00 being invested directly into the LLC. Once the funds are cleared in the IFS account, IFS will transfer the additional $250,000 to the LLC. As a result of the foregoing, Johnny Jung will personally own 100% of IFS and 39% of the LLC and IFS will own the 61% balance of the LLC.... [T]he undersigned [Robin-

---

4. In Merlino's first report, he remarks: "Siu Lap was IFS' exclusive currency broker, yet no person that I interviewed claims to have met anyone from Siu Lap, and only a few employees acknowledged having spoken on the telephone with anyone from Siu Lap." (Kang Decl., Ex. NN at 32.)

son] [will be] the President—Chief Executive Officer of both IFS and the LLC.

(Kang Decl., Ex. H.) Second, an IFS Inc. memorandum dated May 9, 2002, from Jung to Carol C. Poon, an employee of IFS Inc.'s accounting department, and copied to Robinson, states that "effective April 01, 2002, International Financial Services (New York), Inc. will paid [*sic*] to the undersigned $5,000.00 per month as Chairman/Officer Salary." (*Id.,* Ex. M.) Jung testified that he signed this memorandum, but denied that he wrote or dictated it and asserted that it reflected only IFS Inc.'s tentative offer to him with a view to potential future collaboration between IFS Inc. and IFS LLC. (Jung Tr. 112–24.) Third, two other memoranda, both signed by Jung and written on IFS Inc. letterhead, refer to Jung as "Chairman of the Board," and one refers explicitly to Jung's "recent acquisition of International Financial Services (New York), Inc." (Kang Decl., Ex. M.) Jung conceded that his signature appears on these memoranda, but testified that he does not recall signing them or understand their meaning. (Jung Tr. 125–35.) Fourth, Poon testified that she accompanied Jung to Chase Bank to open an account for IFS LLC because, as she understood it, "he's [Jung] purchasing International Financial Services New York, Inc., and he's opening up an International Financial Services New York, LLC account that is to prepare to meet the new whatever regulations ... to do business for FOREX trading." (Poon Tr. 275–77.) Finally, the evidence discloses a series of financial transactions among Jung, IFS Inc., IFS LLC, and Siu Lap (P. Rule 56.1 Stmt. ¶¶ 20–23, 27–31; *see* Kang Decl. Exs. PS), notwithstanding Jung's insistence that neither he nor IFS LLC had any relationship to IFS Inc. or Siu Lap; indeed, Jung testified that before July 2002, when the Commission brought this action, he had not heard of Siu Lap. (Jung Tr. 157–58.)

*Procedural History*

The Commission filed this action on July 17, 2002. Shortly thereafter, the parties submitted a Consent Order of Preliminary Injunction, which the Court entered as an Order dated August 8, 2002. The Order enjoined defendants from perpetrating certain conduct in violation of the CEA and the Commission's regulations, froze defendants' assets, and appointed a receiver, to whom defendants were directed to surrender those assets. Siu Lap and IFS Inc. defaulted and judgments were entered against them on, respectively, August 19, 2002, and July 7, 2003. The Commission now moves for summary judgment against the remaining defendants.

## DISCUSSION

### I. Standard for Summary Judgment

Summary judgment must be granted where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law"; an issue of fact is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party, and the Court must resolve all ambiguities and draw all reasonable inferences in its favor. *Id.* at 255, 106 S.Ct. 2505; *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir. 1995).

To defeat summary judgment, however, the nonmoving party "must do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[C]onclusory allegations or unsubstantiated assertions" will not suffice. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Rather, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") (internal quotation marks omitted).

## II. *Jurisdiction*

As a threshold issue, IFS LLC and Lai dispute the Commission's jurisdiction, arguing that the transactions that IFS Inc. (purportedly) executed for its clients do not qualify as futures contracts over which the Commission possesses regulatory jurisdiction. Because IFS Inc. and Siu Lap defaulted, and both Robinson and Lai asserted their Fifth Amendment privilege against self-incrimination, defendants cannot and do not dispute the factual characteristics of IFS Inc.'s transactions. They rather argue that those very characteristics refute the Commission's assertion that they conducted transactions on a "board of trade" or dealt in "futures contracts" over which the Commission possesses jurisdiction.

### A. *The Treasury Amendment*

█ IFS LLC first argues that IFS Inc.'s activities preceding December 22, 2000, the date on which the CFMA entered into force, constitute "off-exchange transactions," which the Treasury Amendment to the CEA allegedly exempts from the Commission's pre-CFMA jurisdiction. (IFS LLC Br. 8–9.) The Treasury Amendment, adopted in 1974, *see CFTC v. Baragosh*, 278 F.3d 319, 324–25 (4th Cir.), *cert. denied*, 537 U.S. 950, 123 S.Ct. 415, 154 L.Ed.2d 296 (2002), excluded from the CFTC's jurisdiction "transactions in foreign currency, ... unless such transactions involve[d] the sale thereof for future delivery conducted on a board of trade," 7 U.S.C. § 2(i) (1994), which the CEA formerly defined as "any exchange or association, whether incorporated or unincorporated, of persons who are engaged in the business of buying or selling any commodity or receiving the same for sale on consignment." *Id.* § 1a(1). IFS LLC argues that IFS Inc. and its codefendants did not conduct transactions on a "board of trade."

Because of the breadth of the prior definition of "board of trade," which "include[d] both formally organized exchanges and informal associations of persons engaged in the business of buying and selling commodities," the " 'unless' clause of the [A]mendment [had] threaten[ed] to swallow the whole." *CFTC v. Standard Forex, Inc.*, No. 93 Civ. 0088, 1993 WL 809966, at *7–*8 (E.D.N.Y. Aug. 9, 1993); *see also CFTC v. Frankwell Bullion Ltd.*, 99 F.3d 299, 302 (9th Cir. 1996). Partially for that reason, the Ninth Circuit construed the Amendment's limitation on the CFTC's jurisdiction "to exempt all off-exchange transactions in foreign currency." *Id.* at 304. But the predominant view, set forth thoroughly in *Standard Forex*, 1993 WL 809966, at *7–*12, holds that when Congress enacted the Treasury Amendment, limiting the CFTC's jurisdiction to currency transactions "conducted on a board of trade," it intended "to exempt only interbank transactions that were already regulated by the banking regulatory agencies." *Id.* at *10 (collecting cases); *see also CFTC v. Am. Bd. of Trade*, 803 F.2d 1242, 1248–49 (2d Cir.1986); *accord, Baragosh*, 278 F.3d at 327–29.

In *CFTC v. Noble Wealth Data Information Services, Inc.*, 90 F.Supp.2d 676 (D.Md.2000), *rev'd in part on other grounds, Baragosh*, 278 F.3d at 333, which presented facts strikingly similar to those here, *see* 90 F.Supp.2d at 680–83, the district court held that defendant Noble Wealth operated a "board of trade" within the Commission's pre-CFMA jurisdiction. The court observed:

> Noble Wealth recruited traders who had no prior trading experience and urged them to invest their own funds as well as to solicit their friends and families to invest with Noble Wealth. Noble Wealth provided traders with brochures and telephone scripts for use in soliciting potential customers. It also provided the mechanism for traders to get prices, make orders, execute orders and offset those orders with matching opposite transactions. It further confirmed, both orally and in writing, that the traders' orders had been made.... The contracts could be held open indefinitely. They were closed out by entering into an offsetting transaction rather than by taking delivery. These features bring Noble Wealth's activities squarely within the [CEA]'s statutory definition of the term "board of trade," consequently within the jurisdiction of the Commission.

*Id.* at 690–91. IFS Inc., too, recruited inexperienced traders, urged them to solicit customers, including friends and relatives, from their respective ethnic communities, provided the traders scripts and marketing brochures, operated a "dealing room" through which the traders purportedly made and cleared trades through Siu Lap, and offered contracts that "could be held open indefinitely" and that "were closed by entering into an offsetting transaction rather than taking delivery." (P. Rule 56.1 Stmt. ¶¶ 71–73, 78–80, 81–84, 105–06, 128, 140.) Hence, while IFS Inc. clearly did not operate a formal, authorized exchange, it nonetheless operated a "board of trade," as defined by the majority of the case law. *See Lehman Bros. Comm. Corp. v. Minmetals Int'l Non–Ferrous Metals Trading Co.*, 179 F.Supp.2d 118, 156–57 (S.D.N.Y.2000) ("[T]he phrase 'conducted on a board of trade' encompasses more than just transactions conducted on formally organized futures exchanges, i.e., 'on-exchange' transactions. It also encompasses trades that were made off-exchange, i.e., not on an organized futures exchange, as long as the transactions were not conducted between two banks.") IFS LLC's argument that the Treasury Amendment exempts the defendants' pre-CFMA activities, as "off-exchange transactions," from the CFTC's jurisdiction must therefore be rejected.[5]

**5.** Since the CFMA's entry into force, the CEA vests the CFTC with jurisdiction over "an agreement, contract, or transaction in foreign currency that –(i) is a contract of sale of a commodity for future delivery" and "is offered to, or entered into with, a person that is not an eligible contract participant," as defined in 7 U.S.C. § 1a(12), "unless the counterparty" qualifies as one of the entities enumerated in the statute, including financial institutions, registered brokers or dealers, persons associated with registered brokers or dealers, insurance companies, financial holding companies, and investment bank holding companies. 7 U.S.C. § 2(c)(2)(B) (1994 & Supp.2003). The evidence establishes, and defendants do not dispute, that IFS Inc. placed orders on behalf of persons who do not qualify as "eligible contract participants," which include, among others, persons with assets in excess of $10 million or, if such persons transact "to manage the risk associated with an asset owned or liability incurred," $5 million. *Id.* § 1a(12)(xi). Nor do defendants dispute that IFS Inc. and Siu Lap never registered with the CFTC in any capacity and do not qualify as one of the counterparties enumerated in § 2(c)(2)(B)(ii). (*See* P. Br. 30–31.) Accordingly, the CFTC also possesses juris-

### B. *Characterization of IFS Inc.'s Activities*

IFS LLC, joined by Lai, also argues that the Commission lacks jurisdiction – both before and after the CFMA entered into force – because the transactions brokered by IFS Inc. were not, in fact, futures contracts. The parties do not dispute the relevant factual characteristics of the IFS Inc. contracts and transactions; their characterization presents a pure question of law. No statute, however, defines "futures contract." *CFTC v. Hanover Trading Corp.*, 34 F.Supp.2d 203, 205 (S.D.N.Y.1999); *CFTC v. Co Petro Mktg. Group, Inc.*, 680 F.2d 573, 577 (9th Cir. 1982). Its definition must therefore be culled from case law in this and other jurisdictions, mindful that "no bright-line definition or list of characterizing elements is determinative. The transaction must be viewed as a whole with a critical eye toward its underlying purpose." *Id.* at 581.

In *Hanover*, the court stated that futures contracts

> have two salient characteristics. First, futures contracts are contracts for the purchase or sale of a commodity for delivery in the future at a price that is established at the time the contract is initiated. Second, the ability to offset the obligation to purchase by selling the contract, or to offset the obligation to deliver by buying a contract, is essential, since investors rarely take delivery against the contracts. The lack of an expectation that delivery of the physical commodity will be made is an important factor indicating the presence of a futures contract.

34 F.Supp.2d at 205 (citations and internal quotation marks omitted). Similarly, in

*Standard Forex*, 1996 WL 435440, at *10, the court distilled from several cases and regulatory authorities the following "essential elements of a futures contract: (1) an obligation to make or take delivery of a commodity in the future; (2) an ability to offset the putative obligation to make or take delivery and thus realize a gain or loss on the intervening price fluctuation; and (3) a purpose to speculate on the intervening price changes without having to acquire the underlying commodity." Other factors that tend to establish the existence of a futures contract include "standardized ... terms and conditions other than price; ... standardized commodity units, the initial deposit and maintenance of 'margin' or like payments, and no right or interest by the customer in a particular lot or other commodity unit." *In re First Nat'l Monetary Corp.*, No. 79–56, 1985 WL 55299, at *5 (C.F.T.C. Aug. 7, 1985);[6] *see also Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 971 (4th Cir.1993) (observing that while "never precisely defined by statute," a futures contract "is generally understood to be an executory, mutually binding agreement providing for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are fixed").

On their face, the contracts and related transactions brokered by IFS Inc. exhibit most, if not all, of these characteristics. First, IFS Inc. entered into transactions on behalf of its clients whereby they agreed to purchase and sell certain quantities of various foreign currencies, in the future (albeit not on a predetermined date), for prices, or using pricing formulas, agreed upon at the times of the transac-

diction over IFS Inc.'s activities after the CFMA's entry into force.

6. The Commission's views, while not controlling, merit deference. *CFTC v. Schor*, 478 U.S. 833, 844, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986).

tions. (P. Rule 56.1 Stmt. ¶¶ 128–29.) Second, IFS Inc.'s customers had neither the intention nor the ability to take or make delivery of the foreign currencies (*id.* ¶¶ 135, 137); rather, the ICs settled, or at least purported to settle, the contracts by entering into offsetting transactions, thereby realizing gains or losses based on fluctuations in the currencies' values. (*Id.* ¶ 130.) Third, the contracts called for the purchase or sale of standardized amounts of foreign currencies. (*Id.* ¶ 129.) Fourth, IFS Inc. required customers to pay an initial margin and then to fortify their accounts when losses decreased their balances below a certain level. (*Id.* ¶ 132.) Finally, it is undisputed that IFS Inc.'s customers intended "to speculate on the intervening price changes [in foreign currencies] without having to acquire the underlying commodity." *Standard Forex*, 1996 WL 435440, at *10. Viewing IFS Inc.'s transactions "as a whole with a critical eye toward [their] underlying purpose," *Co Petro*, 680 F.2d at 581; *see also In re First Nat'l Monetary Corp.*, 1985 WL 55299, at *4, the Commission's evidence overwhelmingly establishes that IFS Inc.'s ICs brokered futures contracts on behalf of its clients.

Defendants argue, however, that as a matter of law, IFS Inc. brokered "spot," not futures, contracts to its customers (IFS LLC Br. 21; Lai Br. 21), and therefore that the Commission lacks jurisdiction. *See* 7 U.S.C. § 2(c)(2)(B) (defining Commission's jurisdiction relative to foreign currency transactions); *see also Bank Brussels Lambert v. Intermetals Corp.,*

779 F.Supp. 741, 748 (S.D.N.Y.1991). In the terminology of commodities trading, "futures" contracts may be distinguished from both "spot" and "forward" contracts. In *Bank Brussels*, the court explained that "[t]he spot market is essentially the current market, as opposed to the markets for future delivery.... In the conventions of foreign currency trading, spot transactions ordinarily call for settlement within two days," the earliest settlement date deemed practicable. 779 F.Supp. at 748 & n. 5; *see also Standard Forex*, 1996 WL 435440, at *6; *CFTC v. Frankwell Bullion Ltd.*, 1994 WL 449071, at *2 (N.D.Cal. Aug.12, 1994.) Forward contracts, by contrast, contemplate the "actual, though deferred, delivery" of a commodity, and they "entail ... the generally fulfilled expectation that the contract will lead to the exchange of commodities for money." William L. Stein, *The Exchange–Trading Requirement of the Commodity Exchange Act*, 41 Vand. L.Rev. 473, 491 (1988) (internal quotation marks omitted).[7] Historically, farmers and other producers used forward contracts to guarantee themselves buyers at a future date, while buyers, conversely, thereby assured themselves a fixed price.[8] *See Co Petro*, 680 F.2d at 577–78. The quintessential difference between futures contracts, on the one hand, and spot and forward contracts, on the other, is that the latter two contemplate *actual exchange* (delivery and receipt) of the commodity, whether immediately – which means, in practical terms, within two days – or at some fixed future date. By contrast, individuals enter into futures contracts, almost

---

**7.** According to one of the CFTC's experts, forward contracts generally contemplate settlement within three days to five years. (Kang Decl., Ex. UU ¶ 31.)

**8.** "The [CEA] pertains not only to the agricultural commodities, which composed its original concern, but also to 'all other goods and articles ... and all services, rights, and inter-

ests in which contracts for future delivery are presently or in the future dealt in,' 7 U.S.C. § 2, an enlargement due to the continued expansion of futures contracts based on new commodities." *NRT Metals, Inc. v. Manhattan Metals (Non–Ferrous) Ltd.*, 576 F.Supp. 1046, 1050 (S.D.N.Y.1983).

without exception, solely to speculate on the fluctuations in various commodities prices. *See Hanover,* 34 F.Supp.2d at 205 & n. 14; *Standard Forex,* 1996 WL 435440, at *9–*10; *see also Co Petro,* 680 F.2d at 579–80. The parties to a futures contract seldom, if ever, actually deliver or receive the commodity. *Standard Forex,* 1996 WL 435440, at *1. (Kang Decl., Ex. VV ¶¶ 12, 16.)

Defendants argue principally that because the contracts IFS Inc. brokered did not call for future delivery at a *fixed* date (IFS LLC Br. 13), those contracts cannot properly be characterized as futures contracts. Defendants note, and the Commission emphatically agrees, that IFS Inc.'s customers never intended to take or make *actual* future delivery of foreign currency, nor did the contracts entered into by the ICs contain a fixed date for future delivery. (*Id.* 13–15.) This fact, defendants argue, is fatal to the Commission's jurisdiction.

Because "[t]he lack of an expectation that delivery of the physical commodity will be made is an important factor indicating the presence of a futures contract," *Hanover,* 34 F.Supp.2d at 205, at first blush, defendants' argument appears self-defeating. But their position is that, notwithstanding the subjective motivation of IFS Inc.'s clients to speculate, the absence of a fixed delivery date for the foreign currencies makes the transactions brokered by IFS Inc. spot contracts. Defendants rely principally on *Bank Brussels,* which also involved foreign currency trades. There, the investor, whose client did not intend to take or make delivery of the foreign currency, "would roll over [the client's] positions, buying one spot contract after another, thus perpetuating the speculation on a currency over a more extended period of time than contemplated by a single spot transaction." 779 F.Supp. at 748.[9] The court held, first, that while the

9. *Frankwell Bullion,* 1994 WL 449071, involved a relevantly similar form of speculation, *see id.* at *2, and on the Commission's motion for a preliminary injunction, the court in that case opined that "[b]ecause there is a closing daily on each position held by customers – indeed, this is the method in which defendants make their commission – the contracts at issue may well be determined by this Court upon a full adjudication to be spot transactions with the meaning of *Bank Brussels Lambert.*" *Id.* But the court ultimately resolved the case against the Commission on the ground that defendants did not transact on a "board of trade" within the meaning of the Treasury Amendment and therefore did not reach the question of the appropriate characterization of the transactions. *See CFTC v. Frankwell Bullion,* 904 F.Supp. 1072, 1078 (N.D.Cal.1995). The Ninth Circuit affirmed on the same ground. 99 F.3d 299 (9th Cir.1996). *Frankwell Bullion* therefore provides scant guidance on the appropriate analysis for distinguishing spot from futures contracts. Certainly, contrary to defendants' argument (IFS LLC Br. 23–27), *Frankwell Bullion* does not collaterally estop the Com-

mission from asserting that the contracts at issue in this case should be characterized as futures contracts within its jurisdiction. First, the *Frankwell Bullion* court did not, in denying the Commission's motion for a preliminary injunction, "actually and necessarily determine[]" this issue, *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); indeed, in its subsequent decision on the merits, it expressly declined to reach the issue. *See Frankwell Bullion,* 904 F.Supp. at 1078. Second, Frankwell Bullion Ltd., the defendant in *Frankwell Bullion,* is not a party to this case (P. Reply Br. 18 & n. 16), and nonmutual collateral estoppel cannot be asserted against the federal government. *United States v. Mendoza,* 464 U.S. 154, 162, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). While the facts of *Mendoza* involved "nonmutual *offensive* collateral estoppel," *id.* (emphasis added), that decision, contrary to IFS LLC's contention (IFS LLC Reply Br. 13), applies equally to nonmutual *defensive* collateral estoppel asserted against the government. *See Hercules Carriers, Inc. v. Claimant State of Fla.,* 768 F.2d 1558, 1579 (11th Cir.1985) ("Nor do we see any substan-

investor continued to speculate in this way for a long time, "at no moment did [the investor] establish a speculative position calling for future delivery beyond the two day terms of the current 'spot' market"; and second, that although the investor entered into the contracts "solely for speculation," a common trait of futures contracts, that subjective motivation could not alone suffice to transform a spot contract into a futures contract. *Id.* at 749–50. Similarly, defendants here argue, the contracts brokered by IFS Inc. did not require future delivery on a fixed date, but were "rolled over" each day, and were therefore spot transactions regardless of the speculative motive of IFS Inc.'s clients. (IFS LLC Br. 14.)

This argument fails as a matter of both fact and law. First, defendants offer no evidence to substantiate their factual claim that IFS Inc. engaged in transactions in the spot market, as the bank in *Bank Brussels* indisputably did on behalf of its customer. *See* 779 F.Supp. at 742. The CFTC's undisputed evidence confirms that "[t]he contracts offered by IFS Inc. to customers concern[ed] the purchase or sale of commodities for *future* delivery at prices or using pricing formulas that [we]re established at the time the contracts [we]re initiated," and specified *"no delivery dates."* (P. Rule 56.1 Stmt. ¶¶ 128, 133 (emphasis added).) Spot contracts, by contrast, do specify a delivery date – within two days. *Id.* at 748 & n. 5. Second, in *Bank Brussels,* the bank held an account for its client specifically for the purpose of speculating in the "spot market" and thus presumably had the capacity to take or make delivery of the actual

foreign currencies, even if, in practice, it did not do so. *See id.* at 742–43. Here, IFS Inc.'s clients neither expected nor had the capacity to take or make delivery of foreign currencies. (IFS LLC Br. 14.) Finally, defendants offer no evidence to substantiate their factual assertion that the contracts entered into by IFS Inc. "were automatically rolled over" in the same manner as those in *Bank Brussels.* (IFS LLC Br. 14.) Defendants cite only the testimony of Zask, the Commission's expert, to support their claim that IFS Inc. rolled over its clients' contracts on a daily basis. (IFS LLC Br. 5; Zask Tr. 214–17.) Yet Zask clarified:

> [T]he actions undertaken by IFS in extending transactions from one day to the next are not equivalent to spot rate "rollovers" in the interbank spot market.... [T]he IFS "rollover" transactions differed from the standard interbank spot market in at least two ways: First, the IFS transactions did not result in the consummation of the original transaction through the exchange of currencies; second, each day's "rollover" result[ed] in the effective cancellation of the previous day's cont[r]act, whereas transactions in the spot market cannot be cancelled, but must result in the mutual delivery of currencies.

(Kang Supp. Decl., Ex. B ¶ 6.) In *Bank Brussels,* in other words, the investor actually executed one or more new transactions every two days, albeit often simply to extend or offset the original one. By contrast, IFS Inc.'s transactions did not call for settlement within two days, or indeed, by any fixed date.[10]

---

tive difference between nonmutual offensive collateral estoppel which the Supreme Court addressed and nonmutual defensive collateral estoppel; in each instance the concerns express by the Supreme Court are applicable[.]'').

10. IFS LLC asserts that *CFTC v. Zelener,* 03 Civ. 4346, 2003 WL 22284295 (N.D.Ill. Oct.3, 2003), which it characterizes as "factually a carbon copy of this case" (IFS LLC Reply Br. 1), also supports its position. *Zelener* relied on *Bank Brussels* for the proposition that

As a matter of law, defendants wrongly characterize certain indicia of futures contract as essential features of such contracts. Principally, they argue at length that without a fixed date for future delivery, a transaction cannot be a futures contract within the Commission's jurisdiction. They cite no authority for this proposition, however, and *Standard Forex* held to the contrary that "[w]hile futures contracts *generally* have a specified future delivery date, or settlement date, that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'" 1996 WL 435440, at *10 (emphasis added). Ronald B. Hobson, an expert for the CFTC, further explained that

> to the extent that positions can be "rolled over" indefinitely into the future without delivery, their effective purpose and use becomes indistinguishable from that of a futures contracts. IFS account statements that I examined showed a large number of "floating" positions that are carried for several days at a single opening price. Such positions are distinct from typical rolling spot positions the price of which must be renegotiated at least once every two days.

(Kang Supp. Decl., Ex. A ¶ 17.) Such "short-maturity futures contracts" (*id.*) remain "futures contracts" within the Commission's jurisdiction notwithstanding the absence of a fixed delivery date, for "[w]hen instruments have been determined to constitute the functional equivalent of futures contracts, neither [the Commission] nor the courts have hesitated to look behind whatever self-serving labels the instruments might bear." *In re First Nat'l*

*Monetary Corp.*, 1985 WL 55299, at *4 (collecting authorities).

Defendants also argue that the contracts cannot be characterized as futures because they lacked a "fixed price that was established at the time they were initiated." (IFS LLC Br. 22.) The Commission rightly points out that this argument conflates two issues. ICs, on behalf of IFS Inc.'s clients, entered into contracts for the purchase or sale of a foreign currencies in the future at prices fixed at the time of contracting. The ICs received price quotes for various currencies from IFS Inc.'s dealing-room employees. (P. Rule 56.1 Stmt. ¶¶ 105–06.) By contrast, the prices at which the contracts were ultimately offset were not – and indeed, could not be – fixed, for it is precisely this unknown variable that enables a market for foreign currency futures.

In the final analysis, defendants cannot dispute that IFS Inc.'s transactions exhibited the two salient features of futures contracts as set forth in *Hanover*, 34 F.Supp.2d at 205, and their efforts to "exalt form over substance in an attempt to deflect inquiry from the essential elements of a futures contract" are unavailing. *Standard Forex*, 1996 WL 435440, at *10. Jurisdiction has therefore been established, and the Court will proceed to analyze liability under the CEA.

## III. *Liability*

The Commission alleges that defendants engaged in illegal off-exchange trades, 7 U.S.C. § 6(a), solicitation fraud, *id.* § 6b(a)(i), (iii), and unauthorized trades,

---

"[t]he manner of the customers' overall trading, and the purpose for which it was conducted, does not serve to transmute spot trading to trading in futures." *Zelener*, 2003 WL 22284295, at *5. But in both *Zelener* and *Bank Brussels*, "[a]ll of the transactions entered into ... were in the 'spot market,'" *Bank*

*Brussels*, 779 F.Supp. at 742, and thus *did* specify a delivery date: within two days. *Id.* at 743; *Zelener*, 2003 WL 22284295, at *3 (contracts "stated that all trades would be settled within 48 hours"). Here, the contracts entered into on behalf of IFS Inc.'s clients did not specify any delivery date.

*id.* § 6b(a)(iv). While IFS Inc. and Siu Lap have defaulted, the remaining defendants seek to exonerate themselves, in part, by disputing the predicate liability of those entities. Before analyzing the potential liability of Lai and Robinson, as alleged controlling persons, and of IFS LLC, as an alleged common enterprise, the substantive nature and extent of IFS Inc.'s liability must therefore be established.[11]

### A. Illegal Off–Exchange Trades

■ The CEA prohibits commodities futures transactions not "conducted on or subject to the rules of a board of trade which has been designated or registered by the Commission as a contract market or derivatives transaction execution facility for such commodit[ies]." 7 U.S.C. § 6(a)(1); *see CFTC v. Noble Metals Int'l, Inc.,* 67 F.3d 766, 772 (9th Cir.1995). The evidence establishes that IFS Inc. brokered foreign currency futures contracts, which it purportedly cleared through Siu Lap, even though neither IFS Inc. nor Siu Lap ever registered with the Commission. (P. Rule 56.1 Stmt. ¶¶ 3, 123, 144.) While IFS Inc., as explained above, transacted on a "board of trade" for jurisdictional purposes, *see Noble Wealth,* 90 F.Supp.2d at 690–91, it is undisputed that this "board of trade" had not "been designated or registered by the Commission." The Commission's evidence therefore clearly establishes a violation of 7 U.S.C. § 6(a)(1).

### B. Fraud

■ Title 7 U.S.C. § 6b(a) makes it unlawful

> for any person, in or connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person . . . (i) to cheat or defraud or attempt to cheat or defraud such other person; . . . (iii) willfully to deceive or attempt to deceive such other person. . . .

To establish a violation of the CEA's antifraud provisions, the Commission must prove "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." *CFTC v. R.J. Fitzgerald & Co.,* 310 F.3d 1321, 1328 (11th Cir.2002); *see also CFTC v. AVCO Financial Corp.,* 28 F.Supp.2d 104, 115 (S.D.N.Y.1998), *aff'd in relevant part sub nom. CFTC v. Vartuli,* 228 F.3d 94, 101 (2d Cir.2000). Lai contends that the Commission must also establish reliance, that is, that customers reasonably relied on the allegedly misleading statements in deciding to invest.

■ The Commission's evidence establishes that IFS Inc., both through its principals and its so-called "ICs," systematically misled financially unsophisticated clients, often immigrants with poor language skills, into investing large sums of money in transactions virtually guaranteed, if not actually intended, to fail, thereby enriching IFS Inc. and its partner Siu Lap.[12] To perpetrate this fraudulent

---

11. IFS LLC seeks to deflect liability for *all* purported violations by characterizing IFS Inc. as an "introducing broker" to Siu Lap, the alleged true counterparty to trades that IFS Inc. merely "facilitated." (IFS LLC Br. 32–33; IFS LLC Reply Br. 15.) An introducing broker is a person who solicits orders for the purchase or sale of commodities futures, but "does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or

contracts that result or may result therefrom." 7 U.S.C. § 1a(23). The evidence establishes beyond doubt that IFS Inc. accepted money "to margin, guarantee, or secure" the purported trades that it executed on behalf of its clients.

12. In a certain sense, the ICs may well have been as much victims of IFS Inc.'s fraud as their clients. Management taught the ICs negligent trading strategies, required them to

scheme, IFS Inc. falsely represented that it maintained direct links to established networks in Asia, Europe, and the United States, lied to clients about the status of their accounts, issued false or misleading account statements, and grossly misrepresented the risks of foreign currency futures trading, particularly in view of the undisclosed facts that such trades would be entered into by poorly trained ICs with little or no relevant experience, who would be constrained to deal with a single counterparty, Siu Lap, at price quotes that made losses a virtual certainty. *See Noble Wealth*, 90 F.Supp.2d at 685–86 (finding fraudulent misrepresentations on virtually identical facts); *Vartuli*, 228 F.3d at 102 (misrepresentations as to experience of a particular commodities trader and the degree of risk involved in the highly speculative venture of commodities trading constitutes fraud in connection with futures transactions), citing *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 110 (2d Cir.1986); *see also CFTC v. Sidoti*, 178 F.3d 1132, 1135–36 (11th Cir.1999) (affirming district court's conclusion that corporate principals, through certain "associated persons," the functional equivalent of the ICs in this case, violated the CEA's anti-fraud provisions by "(1) falsely telling customers certain market conditions or seasonal trends almost guaranteed profits; (2) baselessly telling customers they could quickly make tremendous returns on their investments; and (3) distorting their bad track records," as well as "downplay[ing] the degree of risk involved").

Faced with the overwhelming evidence of fraud compiled by the Commission, defendant Lai argues, first, that certain risks disclosed by IFS Inc. in writing "establish that misstatements could not be material and could not properly be relied upon" (Lai Br. 12); and second, that for the Commission to prove a violation of the CEA's anti-fraud provisions, it must establish that IFS Inc.'s customers relied on the misrepresentations in deciding to invest. (*Id.* 8–9.) Both of these contentions bear on the elements of materiality and scienter, and will be analyzed in that context.

■ A misleading statement or omission "is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision." *Saxe*, 789 F.2d at 111; *see also*

---

use price quotes from Siu Lap that made it virtually impossible for them to make money for their clients, prohibited them from employing certain strategies, such as "limit orders," to mitigate their losses, and threatened them with demotion or discharge if they failed to generate adequate commissions. Still, for purposes of liability, the actions and omissions of the ICs, as agents, must be imputed to IFS Inc., as principal. *See* 7 U.S.C. § 2(a)(1)(B) ("[T]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment of office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person."); *Stotler and Co. v. CFTC*, 855 F.2d 1288, 1292 (7th Cir.1988) ("[U]nder [§ 2(a)(1)(B)] it does not matter if the principal knew about the agent's acts; he is strictly liable for them."). The totality of the circumstances presented in this case makes it absolutely clear that the ICs acted for and at the direction of IFS Inc.'s management, which trained them, instructed them how to solicit customers, controlled their trading strategies, and paid them based on their performance. *See id.* at 1292; *see also Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir.1986) ("Principals are strictly liable [under 7 U.S.C. § 2(a)(1)(B)] for their agents' acts – even if the agents are not employees – if the principals authorize or ratify the acts or even just create an appearance that the acts are authorized."). Needless to say, IFS Inc.'s decision to denominate its purported brokers/consultants "independent consultants" does not affect the nature of their agency relationship to IFS Inc.

*Noble Wealth,* 90 F.Supp.2d at 686 (same). Without question, reasonable investors would consider the experience and training of the ICs, the constraints on their trading strategies, available price quotes, and trading partners, the accuracy of IFS Inc.'s representations regarding past customer gains and losses, and the risks of foreign currency futures "important in making an investment decision." *Saxe,* 789 F.2d at 111. "Indeed, misrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law." *Noble Wealth,* 90 F.Supp.2d at 686; *see also id.* at 687 (noting that "false representations regarding a broker's expertise are material").

Lai argues, however, that IFS Inc.'s misrepresentations were not material because before investing on behalf of customers, it required them to sign (1) a risk disclosure statement, which informed customers of the risks of foreign currency futures trading, that the trading strategies IFS Inc. employed could fail, and that customers could sustain substantial losses; and (2) a customer agreement, in which customers acknowledged that they understood the risks of foreign currency trading, that they had been advised to seek independent legal advice before signing the contracts, that IFS Inc. disclaimed guarantees of profitability, and that they understood that IFS Inc. did not guarantee either the accuracy of written materials supplied for informational purposes or any oral representations made by the ICs. (Lai Br. 9–11.) Lai's emphasis on these purported disclosures is unavailing for two reasons.

First, the evidence shows that IFS Inc. and its ICs deliberately minimized the importance of these documents, which they characterized as "just a formality" (Kang Decl., Ex. PP), refused to permit customers to take them home to review them, and in one case even forged a customer's initials on them. *See McAnally v. Gildersleeve,* 16 F.3d 1493, 1499–500 (8th Cir. 1994) (holding that where oral representations discounted the significance of written disclosure statements, the fact that customers acknowledged reading such forms did not "preclude a reasonable jury from concluding that plaintiffs justifiably relied on [the] alleged misrepresentations"); *Purdy v. CFTC,* 968 F.2d 510, 521 (5th Cir.1992) ("Disclosure literature accompanying the initiation of an account satisfies a firm's disclosure obligations unless conduct which discounts or minimizes the importance of the disclosures or any factual misrepresentations exist.") (internal quotation marks omitted); *Clayton Brokerage Co. v. CFTC,* 794 F.2d 573, 580 (11th Cir. 1986) ("Oral representations may effectively nullify the warnings in [a risk disclosure] statement by discounting its general significance and its relevance to the customer's particular situation."); *Noble Wealth,* 90 F.Supp.2d at 686–87 ("[S]tatements that lead a customer to believe that a particular investment is virtually risk-free and will almost certainly yield a profit are not protected from claims of fraud simply because the broker made a *pro forma* disclosure of risk.") (internal quotation marks omitted). The evidence also shows that IFS Inc. deliberately solicited financially unsophisticated clients from immigrant communities, many of whom had a poor knowledge of English and therefore relied on the oral representations of the ICs, typically of their own ethnicity, in deciding to open an account with IFS Inc. Under these circumstances, the risk disclosures and customers account agreements to which Lai refers cannot exonerate IFS Inc. from liability for its misrepresentations and misleading omissions.

Second, Lai misconceives the real issue. Even if customers read, signed, and under-

stood the risk disclosure and customer account statements, those documents do not disclose the *actual* material facts: that IFS Inc. adopted trading practices deliberately designed to make clients lose their money, while maximizing commissions for IFS Inc. Zask's undisputed analysis leads him to conclude "that IFS itself reaped the direct losses of the customer accounts, as its own profits." (Kang Decl., Ex. UU ¶ 61; *see also id.* ¶¶ 45–58.) Hobson also concludes that IFS Inc.'s trading strategies were not only derelict, but deliberately designed to generate commissions for IFS Inc. (Kang Decl., Ex. VV ¶¶ 31–36.) And Merlino, the receiver's expert, concluded that "IFS' reason for existence was to collect clients' funds, transfer the funds to Siu Lap in Macao, and purposely arrange to 'lose' these funds in alleged currency trading." (*See* Kang Decl., Ex. ZZ at 9.) Surely, reasonable investors would have wanted to know *that.* In short, the issue is not of an undisclosed risk but of an undisclosed virtual certainty of catastrophic losses.

■ Lai's other argument, that the Commission must also prove reliance, fails as a matter of both fact and law. First, as Lai concedes, "[r]eliance is inherent in the definition of material" (Lai Br. 8), and the CFTC's evidence unequivocally establishes that IFS Inc.'s principal clientele, financially unsophisticated immigrants, relied on the oral representations of IFS Inc.'s principals and ICs, including statements discounting the significance of account documentation and risk disclosure statements

that customers were required to sign. Second, this is not an action by the victims of IFS Inc.'s fraudulent scheme. Victims generally must prove reliance to show that they sustained damages as a result of material misrepresentations made by the defendants, for absent reliance, they cannot establish causation. But where, as here, the CFTC, an administrative agency, brings an enforcement action, reliance is not a necessary element of a violation under the CEA. *Slusser v. CFTC,* 210 F.3d 783, 785–86 (7th Cir.2000); *see also CFTC v. Rosenberg,* 85 F.Supp.2d 424, 446–47 (D.N.J.2000) ("[C]ustomer reliance need not be proven in an enforcement action alleging fraud.").[13]

■ The final element of fraud under the CEA that the Commission must establish is scienter, which generally means "intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), though in the context of the CEA, scienter also may be shown by proof of recklessness. *Drexel Burnham Lambert Inc. v. CFTC,* 850 F.2d 742, 748 (D.C.Cir.1988); *accord, Crothers v. CFTC,* 33 F.3d 405, 411 (4th Cir.1994). The evidence shows that IFS Inc. recruited largely inexperienced ICs, who were encouraged to solicit clients principally from poor immigrant communities that shared the ICs' ethnicities. The clients relied on the IFS Inc.'s written and oral misrepresentations about its operations in deciding to open an account. The evidence therefore compels the conclusion that IFS Inc. at best recklessly, if not

---

**13.** The cases cited by Lai for the proposition that the Commission must establish reliance involved private plaintiffs' actions for common-law fraud under New York law, not statutory fraud under the CEA. (Lai Br. 13.) *See, e.g., Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir.1984); *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.,* 785 F.Supp. 411, 419 (S.D.N.Y.1992). Moreover, as Judge Easterbrook has noted, because the CEA makes actionable not only fraud, but the "attempt to cheat or defraud," 7 U.S.C. § 6b(a)(i), it may be "unnecessary to show reliance even in a private action – for an attempt that fails (perhaps because no one relied on it) is nonetheless a violation." *Slusser,* 210 F.3d at 786.

deliberately, lost the overwhelming majority of the clients' funds by engaging in derelict trading practices designed to enrich Siu Lap and generate commissions for itself. Clients who lost money were instructed to fortify their accounts with additional funds, lest their previous losses become unrecoverable. Unquestionably, these facts establish scienter. *See Noble Wealth,* 90 F.Supp.2d at 686 (finding scienter on virtually identical facts, where "[t]he uncontested record establishe[d] that [defendants] knew that their profit and risk claims were false, knew that they were misrepresenting the qualifications of their traders, knew that the account statements issued to customers and traders falsely represented that [they] were purchasing foreign currency contracts, ... knew that they were engaging in the misappropriation of funds," and "urged existing customers to send additional funds to [them] when the market purportedly moved against their position"); *see also AVCO,* 28 F.Supp.2d at 116.

### C. *Unauthorized Trading*

 The Commission also alleges that IFS Inc. engaged in unauthorized trading on customer accounts. 7 U.S.C. § 6b(a)(iv); *see Haltmier v. CFTC,* 554 F.2d 556, 560 (2d Cir.1977) ("There is now no doubt that it is a violation of the Commodity Exchange Act for an account executive in the commodity brokerage business intentionally to carry on trading transactions not authorized by his customer."); *see also Crothers,* 33 F.3d at 409 ("Unauthorized trading constitutes a violation of section 4b [of the CEA] when an associated person executes trades without the customer's permission or contrary to the customer's trading instructions.").

Lai argues that because each IFS Inc. client signed a power of attorney authorizing the ICs "to buy, sell, exchange or transfer at any price foreign exchange contracts ... and to give trading orders and instructions in connection therewith," an issue of fact exists as to whether the powers of attorney authorized the trades, notwithstanding the Commission's evidence that many clients "did not grasp the meaning of the power[s] of attorney." (Lai Br. 16.) Furthermore, while the Commission proffers affidavits from clients who allege that ICs traded on their accounts without authorization or contrary to their instructions, Lai contends that this evidence is ambiguous. (*Id.* 16–18.) Neither of these contentions raises a genuine issue of material fact.

First, the "Special Power of Attorney" signed by IFS Inc.'s clients authorized the ICs, in relevant part, "to buy, sell, exchange, assign or transfer at any price [the IC] *deems fair* foreign exchange contracts or any other contracts or property as to which *IFS* transacts business." (Kang Decl., Ex. MM, Tab 2) (first emphasis added). It did not authorize IFS Inc. or its ICs to engage in trades at price quotes that the ICs knew to be *unfair* to generate commissions for IFS Inc. The CFTC's evidence establishes that IFS Inc. pressured the ICs to engage in numerous trades at highly unfavorable price quotes, which differed dramatically from those shown on a streaming Reuters feed and which made it virtually impossible for customers to profit. (P. Rule 56.1 Stmt. ¶¶ 106–107.)

Second, as the Commission argues at length, IFS Inc. both minimized the importance of the powers of attorney and made oral representations and assurances that, notwithstanding such documentation, trades would not be concluded without the customers' specific authorization. (P. Br.37.) ICs told one client, for example, that "the 'power of attorney' language in the customer agreement was IFS's term for a broker, and that ... no trades would

be made on [his] account without [his] approval." (Kang Decl., Ex. QQ ¶ 20.) The ICs repeatedly assured this client that they would "check with [him] first" before making trades. (*Id.* ¶¶ 9, 16.) Another client, despite signing a power of attorney, insisted on certain conditions without which he refused to open an account, including that the IC "could not trade below any existing money in the account and thereby subject [him] to a margin call," and that he "would have to agree to every transaction before she executed anything." (Kang Decl., Ex. SS ¶ 5.) The IC assured him that she would abide by these conditions. (*Id.* ¶ 6; *see also* Kang Decl., Ex. PP ¶ 13 (affidavit of another client testifying that an IC told him "that he would telephone [him] to seek approval before making any trade").) Furthermore, in some cases, ICs falsely represented to customers that they would cease to trade if the customers' accounts fell below a certain value. (Kang Decl., Ex. QQ ¶ 17; Ex. SS ¶¶ 5, 11–12.)

Lai seeks to create an issue of fact by arguing that some of the customer affidavits do not conclusively establish that the ICs traded on customer accounts after being specifically instructed to cease all activity on those accounts. (Lai Br. 17–18; P. Br. 38.) But the Commission need not prove this proposition to prevail. It need only prove that the ICs traded on accounts without authorization or contrary to explicit constraints placed by the customers on the ICs when they opened their IFS Inc. accounts. The affidavits reviewed above establish just that. The CFTC therefore merits summary judgment on its allegation of unauthorized trading.

## IV. Controlling Person Liability

The foregoing analysis overwhelmingly establishes IFS Inc.'s liability under the CEA. But IFS Inc., of course, has default-ed. While this preliminary analysis confirms its culpability, the question at this juncture is whether the individual defendants Lai and Robinson can legally be characterized as controlling persons who bear liability for IFS Inc.'s violations.

Title 7 U.S.C. § 13c(b) provides:

> Any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

This provision enables the Commission "to reach behind the business entity to the controlling individual and to impose liability for violations of the Act directly on such individual." *In re Currency Trading Sys.*, No. 00–06, 2001 WL 1356196, at *12 (C.F.T.C. Nov. 6, 2001) (internal quotation marks omitted). "To establish that a defendant controlled a corporation for purposes of § 13c(b), the Commission must show that the defendant exercised general control over the operation of the entity principally liable *and* possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised." *Baragosh*, 278 F.3d at 330 (internal quotation marks omitted; emphasis in original.) Hence, a controlling person need not actually exercise the power to control unlawful conduct or participate in illegal acts; it suffices if he enjoys the ability to do so, has actual or constructive knowledge of the violations, and refrains from acting. *See Monieson v.*

*CFTC,* 996 F.2d 852, 860 (7th Cir.1993); *In re Currency Trading Sys.,* 2001 WL 1356196, at *12. Moreover, as in the context of securities law, "the issue of control is a determination based upon the totality of the circumstances, including an appraisal of the influence upon management and policies of a corporation by the alleged control person." *AVCO,* 28 F.Supp.2d at 117, citing *United States v. Corr,* 543 F.2d 1042, 1050 (2d Cir.1976); *accord, Baragosh,* 278 F.3d at 330.

### A. *Robinson*

While Robinson did not oppose the Commission's summary judgment motion, it remains the Commission's evidentiary burden to establish his liability under § 13c(b). *See Baragosh,* 278 F.3d at 331; *see also Monieson,* 996 F.2d at 858 (observing that § 13c(b), while "patterned on similar provisions in the securities laws," does not require the defendant to prove good faith, but rather requires the Commission to prove "lack of good faith").[14] Nevertheless, because Robinson asserted his Fifth Amendment privilege against self-incrimination at his deposition, in evaluating the Commission's evidence, the Court may draw adverse inferences from his silence. *See Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *LiButti v. United States,* 107 F.3d 110, 121 (2d Cir.1997). While this inference alone does not suffice to meet the Commission's evidentiary burden, *see SEC v. Enters. Solutions, Inc.,* 142 F.Supp.2d 561, 566 n. 1 (S.D.N.Y.2001), it significantly bolsters the Commission's independent evidence.

■ That evidence amply suffices to establish Robinson's liability under § 13c(b). Robinson, the President and Chief Executive Officer of IFS Inc., ran IFS Inc.'s daily activities, supervised its employees, handled customer complaints, enjoyed general signatory authority over checking accounts held for IFS Inc., reviewed customer accounts regularly, and knew that IFS Inc.'s ICs operated under constraints that made it virtually impossible for customers to profit. (P. Rule 56.1 Stmt. ¶¶ 33–42, 145–51.) Both IFS Inc.'s ICs and their clients complained to Robinson about the losses caused by IFS Inc.'s trading practices and made him aware that those practices inevitably would cause further losses. (*Id.* ¶¶ 149, 151–52; Kang Decl., Ex. LL at 9 ¶ 27–29.) But both the ICs, whom Robinson controlled, and Robinson himself, generally responded to complaints by telling customers that to recover their losses and regain any hope of profiting, they must add more money to their accounts. (P. Rule 56.1 Stmt. ¶ 153; Kang Decl., Ex. OO at 4 ¶ 17; Ex. SS at 3–4 ¶ 11; Ex. MM at 7 ¶ 27.) Unquestionably, Robinson "exercised general control over the operation of the entity principally liable *and* possessed the power or ability to control the specific transaction[s] or activit[ies] upon which the primary violation[s] w[ere] predicated." *Baragosh,* 278 F.3d at 330 (internal quotation marks omitted; emphasis in original.) Accordingly, he bears controlling person liability for IFS Inc.'s violations of the CEA pursuant to § 13c(b).

### B. *Lai*

Lai's liability under § 13c(b) presents a slightly more complicated analysis. Because Lai failed timely to respond to Commission's requests for admissions (P. Rule

---

14. The Seventh Circuit has said that "[a] controlling person acts in bad faith if he did not maintain a reasonably adequate system of internal supervision and control ... or did not enforce with any reasonable diligence such system." *Monieson,* 996 F.2d at 860 (internal quotation marks omitted).

56.1 Stmt. ¶ 69), the substance of those admissions, which if treated as established facts would virtually compel the Court to find Lai liable as a controlling person, should not only be deemed admitted pursuant to Fed.R.Civ.P. 36(a), but "conclusively established" pursuant to Fed. R.Civ.P. 36(b). *See Moosman v. Joseph P. Blitz, Inc.*, 358 F.2d 686, 688 (1966). On September 9, 2003, however, after the Commission had already moved for summary judgment relying, in part, on Lai's failure to respond to its requests for admissions, Lai belatedly moved to withdraw those admissions. Briefly, Lai argues that his former counsel withdrew for Lai's failure to pay counsel's fees at about the same time that the Commission served its requests on Lai; that counsel passed the requests on to Lai with a note that failed to explain their significance; and that by the time Lai retained new counsel, his time to respond to the requests had long since expired. Lai therefore asks that he be permitted to withdraw his admissions and substitute proper responses, citing his former counsel's alleged failure adequately to impress upon him their importance, his temporary *pro se* status, and his less-than-fluent command of the English language. The Commission responds principally that it relied on Lai's conclusively established admissions in preparing its summary judgment motion, and to allow Lai to withdraw them at this juncture would severely prejudice it.

█ Fed.R.Civ.P. 36(b) provides that "the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits." The Commission correctly notes that *pro se* litigants must learn and comply with procedural rules in civil litigation. *McNeil v. United States*, 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993); *LoSacco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir.1995). Lai's temporary *pro se* status does not constitute excusable neglect. Furthermore, it is difficult to see how authorizing Lai to withdraw his admissions will subserve the merits. Lai does not intend to offer substantive answers to the Commission's Requests. His proposed responses consist almost entirely of assertions of his Fifth Amendment privilege against self-incrimination. (Kliegerman Decl., Ex. E.) Finally, were the Court to permit Lai to withdraw his admissions, it might need to give the Commission leave to amend its motion papers and Lai an opportunity to respond to those revised papers, further delaying the resolution of this action and the payment of restitution to the victims of IFS Inc.'s fraud.

Nevertheless, the Court remains reluctant to decide the merits of Lai's potential liability as a controlling person based on admissions deemed conclusively established by the default of a *pro se* litigant with a poor command of English. Moreover, while Lai's proposed responses add little, if anything, to the evidence, Lai's assertion of his Fifth Amendment privilege against self-incrimination, which permits an adverse inference, differs significantly from an admission, which conclusively establishes a fact. Because the Court concludes that summary judgment should be granted against Lai in any event, and therefore that the Commission will not be prejudiced by the grant of Lai's motion, the Court will deem Lai's proposed answers (Kliegerman Decl., Ex. E) substituted for his default admissions and analyze Lai's liability under § 13c(b) on that record.

Even without resort to the adverse inference that Lai's assertion of the Fifth Amendment entitles the Court to draw, the CFTC's affirmative evidence strongly establishes Lai's liability as a controlling person. Lai hired Robinson to run IFS Inc. (Kang Decl., Ex. V at 58) and sat on the company's board of directors, in which capacity he advised Robinson with respect to the "basic objectives" and "tone of the company." (Kang Decl., Ex. U, Tab 1 at 25.) Robinson and Lai spoke "regularly" and had a "continuous relationship" (*id.* at 26; *see also* Kang Decl. Ex. U at 116–17), and Lai appears to have had authority over Robinson. Poon testified that on occasions she would call Lai and ask him to convey instructions to Robinson, and in general, provided Lai instructed Robinson, Robinson would "let [her] do it." (Kang Decl., Ex. N at 218–19.) Zhu, IFS Inc.'s dealing room manager (Kang Decl., Ex. NN at 27), told Lai about customer complaints and testified that Lai called "a couple of times a week" to find out about the number of new customer accounts and their status. (Kang Decl., Ex. C at 126–27, 151–52.) Zhu further testified that, in addition to himself and Robinson, Lai received a copy of IFS Inc.'s business report every day. (*Id.* at 94–96.) At least one IFS Inc. employee, Rosen, made Lai aware of the unfavorable "spread" between IFS Inc.'s dealing room price quotes and those provided by the Reuters feed. (Kang Decl., Ex. D at 111–12.) Rosen also testified that she discussed her concerns about the ICs' inexperience with Lai. (*Id.* 100–101.) Lai told her to put pressure on the ICs in her group to generate additional commissions, even though he knew customers were consistently losing money, and he promised to promote her to "assistant vice-president if [her] group met the monthly [commission] quota." (*Id.* 103–04.) Finally, a number of persons at IFS Inc. referred to Lai as "losai," a Chinese word that can be translated as "boss" (Kang Decl., Ex. B 140–42), though Lai disputes that it has the same connotation as the English word. (Lai Br. 19.)

In addition to this evidence, Lai asserted his Fifth Amendment privilege in response to the following requests for admissions, among many others:

Q69. Lai had knowledge that the IFS Inc. ICs solicited customers without making reference to IFS Inc.'s history of losses in customer accounts.

Q70. Lai had knowledge that ICs traded for customer accounts without obtaining the customer's consent.

Q71. Lai was responsible for setting out IFS Inc.'s practices, policies, and trading strategies.

Q72. Lai had knowledge that IFS Inc. customers could not make a profit based upon IFS Inc.'s commission and fees structure and trading strategy.

(Kliegerman Decl., Ex. E at 12.) Throughout his deposition, Lai asserted the Fifth Amendment in response to countless questions about his knowledge of and culpability for IFS Inc.'s practices. (Kang Decl., Ex. DD.) The evidence reviewed above, coupled with the adverse inferences to be drawn from Lai's assertion of the Fifth Amendment at his deposition and in response to requests for admissions, amply supports the conclusion that Lai, as a shareholder and director of IFS Inc., enjoyed substantial authority to control IFS Inc.'s activities, had actual or constructive knowledge of its violations, and at a minimum, refrained from taking steps to forestall those violations, if not actually masterminded and encouraged them. Moreover, Lai cites no evidence in the record that tends to refute this conclu-

sion.[15] Accordingly, the Commission has established that Lai bears controlling person liability for IFS Inc.'s violations. *See Monieson,* 996 F.2d at 861 ("When there are repeated charges of illegal behavior from different sources, a controlling person has a duty to act; he cannot simply avoid addressing the issue and hope it goes away.")

V. *IFS LLC's Liability as a Common Enterprise*

The Commission argues that, as a "common enterprise," IFS LLC bears joint and several liability for IFS Inc.'s violations of the CEA. (P. Br.38–41.) The parties do not dispute the legal standard to be applied to determine whether a common enterprise existed. In *Noble Wealth,* the court articulated the following relevant indicia of a common enterprise:

> common control, the sharing of office space and officers, whether business is transacted through a maze of interrelated companies, the commingling of corporate funds and failure to maintain separation of companies, unified advertising, and evidence which reveals that no real distinction existed between the Corporate Defendants.

90 F.Supp.2d at 691 (internal quotation marks omitted); *see also Del. Watch Co. v. FTC,* 332 F.2d 745, 746 (2d Cir.1964).

The Commission's evidence shows that on February 7, 2002, Robinson wrote to Burke, counsel for IFS Inc., about IFS Inc.'s intention to establish IFS LLC, which would be capitalized principally by contributions from Jung. Jung would then become the sole owner of IFS Inc. and a major shareholder of IFS LLC, while Robinson, according to the letter, would become the president and chief executive officer of both IFS Inc. and IFS LLC. (Kang Decl., Ex. H.) On February 12, 2002, Burke wrote to the Commission "Re: International Financial Services (New York), LLC," explaining that IFS Inc. retained him to "restructure" the firm and register it as an FCM. (Kang Decl., Ex. G, Tab 3.) On February 20, 2002, Jung transferred $250,000 to IFS Inc.'s Chase Manhattan Bank account.[16] (Kang Decl., Ex. P.) On March 19, 2002, IFS Inc. wrote a check to IFS LLC, cosigned by Poon, an IFS Inc. employee, on which the words "capital injection" appear. (Kang Decl., Ex. Q.) Two days later, on March 21, 2002, IFS LLC applied to the Commission to be registered as an FCM. (Kang Decl., Ex. G, Tab 2.) The application represents that IFS Inc. and IFS LLC share the same office and telephone number; that IFS Inc. is IFS LLC's corporate principal; and that Jung, the self-described "Chairman" of IFS LLC, is also chairman of IFS Inc. (*Id.*) Furthermore, an IFS Inc. memorandum dated May 9, 2002, from Jung to Poon, and copied to Robinson, states that Jung will be paid $5000 per month for his services as an officer or chairman of IFS

---

**15.** The cherry-picked evidence canvassed by Lai in his brief establishes only that he did not involve himself in certain aspects of IFS Inc.'s operations. (*See* Lai Br. 5.) For example, he "did not write the promotional or marketing material used by IFS," "deal with customers" or "establish the curriculum for the [IC] training program." (*Id.*) But Lai's liability as a controlling person does not depend on his involvement in the daily operations of IFS Inc.; it depends on his knowledge and power, even if he did not exercise that power to control or influence certain aspects of IFS Inc.'s business.

**16.** Also in evidence are the records of three other wire transfers, of $20,000, $32,000, and $13,000, from Jung to IFS Inc., which bear the dates January 20, February 10, and February 22, 2000, respectively. (Kang Decl., Ex. S.) Bank records also show that Jung received substantial sums of money from Siu Lap's Bank of China account on several occasions. (Kang Decl., Ex. R.)

Inc. (Kang Decl., Ex. M.) Two other memoranda, from Jung and written on IFS Inc. letterhead, describe Jung as "Chairman of [IFS Inc.'s] Board" and refer to his acquisition of IFS Inc. (*Id.*) Jung's signature, which he admitted under oath to be his, appears on all of these memoranda. Finally, while IFS LLC, like Lai, has moved to withdraw its admissions, because IFS LLC failed timely to respond to the Commission's request for admissions, were the Court to deny IFS LLC's motion, those admissions would be conclusively established. Fed.R.Civ.P. 36(b). The admissions, if allowed to stand, would thus not only corroborate, but conclusively establish, *inter alia,* that IFS Inc. and IFS LLC shared the same office and telephone number; that Jung served as "a board member and chairman" of both entities; and that "IFS LLC was created to transact the same business operation as IFS Inc." (Kang Decl., Ex. E ¶¶ 47–50.)

Against this mountain of evidence, IFS LLC proffers only Jung's deposition. Jung denies that IFS LLC had any business relationship with IFS Inc., Lai or Siu Lap. (Jung Tr. 37, 42, 63.) He claims never to have seen IFS LLC's application to the Commission, despite acknowledging that his signature appears on page ten of that application. (*Id.* 81–93.) He denies any recollection or understanding of the IFS Inc. memoranda that refer to his acquisition of IFS Inc., describe him as its chairman, and bear his signature. (*Id.* 125–35.) He cannot recall how it came to be that IFS Inc. wrote a check for $250,000 to IFS LLC. (*Id.* 138–43.) And he testifies that before July 2002, he had never heard of Siu Lap, notwithstanding the existence of bank records indicating that Siu Lap wired Jung substantial sums of money through the Bank of China on several occasions (*id.* 157–64; Kang Decl.,

Ex. R), and a letter from Jung, dated November 2, 2000, written as "Director" of Frankwell International Brokerage Services (Bahamas), Ltd., in which Jung states that Frankwell has assigned a client account to "[its] overseas broker, Sociedade Comercial Siu Lap, Limitada." (Kang Decl., Ex. YY.)

Of course, while Jung's testimony is difficult to credit and contrary to the great weight of the evidence offered by the Commission, in general, the Court "do[es] not sit to judge witness credibility on a motion for summary judgment." *Neidich v. Estate of Neidich,* 222 F.Supp.2d 357, 368 (S.D.N.Y.2002). Thus, IFS LLC argues, Jung's testimony creates a genuine issue of material fact precluding summary judgment. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. But to view the evidence in the light most favorable to the nonmoving party, resolving ambiguities and drawing all inferences in its favor, *see id.* at 255, 106 S.Ct. 2505, is not to suspend disbelief. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348, and "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.* at 587, 106 S.Ct. 1348 (internal quotation marks omitted). Here, even without resort to the admissions that have been conclusively established by IFS LLC's failure timely to respond to them, the Court seriously doubts that any rational juror, viewing the record as a whole, could find for IFS LLC.

▮ It is in this context that IFS LLC moves to withdraw its admissions. The motion will be denied. First, unlike Lai, IFS LLC has never been *pro se.*[17] It

---

17. Indeed, as a corporate entity, IFF LLC

could not be *pro se. Rowland v. Cal. Men's*

failed to reply to the Commission's requests for admissions, not for lack of representation or appreciation of their significance, but because its attorney forgot about them for nearly five months, until receipt of the Commission's summary judgment motion jogged his memory.[18] (Burke Decl. ¶¶ 2–5.) Second, IFS LLC's failure to respond to the request for admissions was not an anomalous oversight; this defendant has a documented history of discovery neglect and delay, including filing untimely responses to discovery demands without seeking leave from either its adversary or the Court. (Kang Decl. ¶¶ 7–14; P. Br. in Opp. to IFS LLC Mot. 2–3.) *See Baker v. David A. Dorfman, P.L.L.C.,* No. 99 Civ. 9385, 2000 WL 420551, at *5 (S.D.N.Y. Apr.17, 2000) ("The defendants' failure to comply with the clear dictates of Rule 36(a) or to respond to plaintiff's requests for admission in any way is inexcusable, particularly in light of their history of reluctance to participate in discovery in this case.") Third, IFS LLC cannot show that giving it leave to withdraw its admissions will subserve the merits, *see* Fed.R.Civ.P. 36(b), for it does not intend to introduce new evidence, but rather to rely on Jung's testimony.

(IFS LLC Br. 4, 9–13.) *See Baker,* 2000 WL 420551, at *6 (denying defendants' motion to withdraw admissions in part because "the defendants' proposed responses are nonresponsive," and "defendants have not shown that truthful responses to the requests for admissions would be denials"). Finally, the Commission could be prejudiced by the grant of IFS LLC's motion: With the admissions, summary judgment is appropriate despite Jung's testimony; absent the admissions, however incredible Jung's testimony appears on its face, an issue of fact arguably exists, potentially requiring a hearing and delaying the resolution of this action, which would prejudice not only the Commission, but the victims of the fraud.

■ The decision to permit withdrawal of admissions lies within the discretion of the district courts, and should be exercised "only when (1) the presentation of the merits with be aided *and* (2) no prejudice to the party obtaining the admission will result." *Donovan v. Carls Drug Co.,* No. 82–6270, 1983 WL 162166, at *1 (2d Cir. Feb.22, 1983) (emphasis in original); [19] *see also Moosman,* 358 F.2d at 688 (untimely replies · may be permitted by the district

---

*Colony,* 506 U.S. 194, 201–202, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993). The failure of such an entity to appear through counsel would constitute a default. *See, e.g., Bristol Petroleum Corp. v. Harris,* 901 F.2d 165 (D.C.Cir. 1990).

**18.** Counsel for IFS LLC states that he received and reviewed the Commission's requests upon receipt, but neglected to put them on his calendar. (Burke Decl. ¶ 2.) On April 30, 2003, he received the Commission's responses to IFS LLC's own requests for admissions, but this event, too, did not remind him to respond to the Commission's requests. "A party is presumed to be adequately represented by the counsel of its choice, and hence the failure of counsel – if such it be – to provide timely discovery responses is imputed to the client." *Beberaggi v. N.Y. City Transit*

*Auth.,* No. 93 Civ. 1737, 1994 WL 18556, at *3 (S.D.N.Y. Jan. 19, 1994).

**19.** Several Courts of Appeals, including our own, prefer to pretend that "unpublished" opinions (which of course are published electronically in databases in which they are searchable interchangeably with those opinions the Courts of Appeals are prepared to acknowledge) do not exist. While recognizing that such opinions do not constitute binding precedent in the Second Circuit, this Court finds even the less-considered words of distinguished panels of judges highly persuasive. Surely, such "unpublished" opinions are at least as valuable to a district judge considering thorny legal issues as the musings of the authors of student law-review notes, which are freely citable.

courts under "compelling circumstances"); *Beberaggi,* 1994 WL 18556, at *3. While a court on summary judgment must defer credibility judgments to the ultimate fact-finder, no comparable constraint limits the Court's authority to assess facts relevant to the exercise of its own discretion to decide whether to excuse a procedural default, particularly where, as here, the Federal Rules of Civil Procedure explicitly and clearly set forth the consequences of such a default. Furthermore, Jung's assertions are not only inconsistent with logical inferences drawn from documents; they flatly contradict or lamely attempt to explain facts conclusively established by documentary evidence. It is a *fact,* for example, that IFS Inc. provided funds to IFS LLC (Kang Decl., Ex. Q), regardless of Jung's recollection of the circumstances of this transaction. Equally, whether or not a reasonable fact-finder could credit Jung's self-serving testimony that he signed the final page of IFS LLC's application to the CFTC without reading or approving the information contained in it (Kang Decl., Ex. O 81–93), it is a *fact* that the application represents that IFS Inc. is a principal of IFS LLC, and that the two share a common address and telephone number. (Kang Decl., Ex. G, Tab 2.) In deciding whether it would "subserve the merits" to allow IFS LLC to withdraw its admissions, the Court need not turn a blind eye to the patently incredible nature of Jung's testimony, or to the overwhelming proof of facts consistent with IFS LLC's admissions, which Jung's testimony ineffectively attempts to refute. In short, IFS LLC cannot establish that either of the conditions for the withdrawal of admissions – that "(1) the presentation of the merits with be aided *and* (2) no prejudice to the party obtaining the admission will result," *Donovan,* 1983 WL 162166, at *1 (emphasis in original) – are met here, and certainly, has not shown "compelling circum-stances," *Moosman,* 358 F.2d at 688, that justify its failure timely to respond to the Commission's requests. Its motion to withdraw its admissions is therefore denied.

■ With these admissions in evidence, there can be no question that IFS Inc. and IFS LLC engaged in a common enterprise. While it is true that IFS LLC did little more than apply for a license to become an FCM and open a bank account (IFS LLC Br. 28), IFS Inc. created IFS LLC and capitalized it to transact the same business as IFS Inc., at the direction of the same corporate officers and directors (Lai, Robinson, Jung), with the same foreign corporate partner (Siu Lap), operating out of the same office space. *See Noble Wealth,* 90 F.Supp.2d at 691. Accordingly, IFS Inc. and IFS LLC engaged in a common enterprise, and IFS LLC therefore bears joint and several liability for IFS Inc.'s violations of the CEA.

## CONCLUSION

For the reasons set forth above, Lai's motion to withdraw his admissions is granted; IFS LLC's motion to withdraw its admissions and its cross-motion for summary judgment are denied; and the Commission's motion for summary judgment is granted. The Commission shall submit a proposed order of judgment within ten days.

SO ORDERED.